**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SEAN TAITT, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-1557 (RC) |
| | : | | |
| v. | : | Re Document No.: | 19 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

**I. INTRODUCTION**

This case arises out of the October 12, 2000 terrorist bombing of the U.S.S. Cole ("the

Cole") in Yemen, which killed or injured dozens of U.S. Navy sailors. *See* Compl. ¶¶ 4.2–4.7,

ECF No. 1. This Court granted a motion for default judgment against Iranian and Sudanese state

defendants in a prior case arising out of the same incident brought by the mother and four

brothers of one of the seventeen American sailors killed in the bombing. *See Flanagan v.*

*Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015); Notice of Related Case, ECF No. 2.

Plaintiffs in the present case are twenty-five of the forty-two American sailors who were injured

in but survived the attack ("Directly Injured Plaintiffs") and thirty-three of their immediate

family members ("Family Plaintiffs").[1] *See* Ex. BB to Pls.' Suppl. Mem. Supp. Pl.'s Mot.

("Suppl. Mem."), ECF No. 20-1; *Flanagan*, 87 F. Supp. 3d at 98. Plaintiffs bring claims for

---

[1] Seven additional Plaintiffs named in the Complaint voluntarily dismissed the action
before the remaining Plaintiffs moved for default judgment. *See* Notice of Voluntary Dismissal,
ECF No. 18; *see also* Wright & Miller, 9 *Fed. Prac. & Proc. Civ.* § 2362 (4th ed.) ("The power
to drop some plaintiffs or defendants from [a] suit plainly exists, either explicitly in the Federal
Rules or in the district court's inherent power.").

intentional infliction of emotional distress ("IIED") and solatium under section 1605A of the

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, and seek compensatory

and punitive damages.  Compl. ¶¶ 6.1–6.8.  The Complaint names the states of Iran and Sudan as

Defendants, but Sudan has been dismissed so Iran is the sole remaining Defendant.  *See* Order of

Dismissal, ECF No. 13.  Iran has not entered an appearance, so default was entered on July 20,

2021, s*ee* ECF No. 16, and Plaintiffs filed their Motion for Default Judgment ("Pls. Mot.") on

May 12, 2022, ECF No. 19.  For the reasons set forth below, the Court grants Plaintiffs' motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Al-Qaeda[3]

"Al Qaeda is a worldwide terrorist network led by Osama Bin Laden," who founded the

network in Afghanistan in approximately 1990 "to serve as a base for like-minded Sunni Islamic

---

[2] The Federal Rules of Evidence authorize a court to take judicial notice of "adjudicative facts" "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201(b), including "court records in related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citations omitted).  Because of the number of individuals affected by terrorist attacks, and the associated "flood of cases that they generate," courts hearing FSIA claims "regularly" take judicial notice of factual findings from related cases.  *Goldstein v. Islamic Republic of Iran*, No. 16-CV-2507, 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018) (citing *Rimkus*, 750 F. Supp. 2d at 171); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 262–63 (D.D.C. 2006).  In line with this approach, here, the Court takes judicial notice of facts found through extensive proceedings in *Flanagan* and another FISA case arising out of the Cole bombing, *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007).  In addition to accepting evidence from documents and affidavits, the Court in *Flanagan* held an evidentiary hearing at which five qualified experts testified.  *See Flanagan*, 87 F. Supp. 3d at 96–97.  The Court also took judicial notice of the findings from *Rux*, *see id.* at 96, in which the court considered 183 exhibits, including transcripts of expert depositions, a transcript of federal criminal proceedings against Osama Bin Laden, and various government reports concerning terrorism and the Cole bombing in particular, *see Rux*, 495 F. Supp. 2d at 543.

[3] The Court will use the spelling "Al-Qaeda" and "Osama Bin Laden," though cited materials may use slightly different spellings.

extremists." *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 548 (E.D. Va. 2007). Al Qaeda has "organized, executed, or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001, attacks on the United States," and has supported or trained terrorists in countries including Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Kosovo, the Philippines, Algeria, Eritrea, and, as relevant here, Yemen. *Id.* "Bin Ladin saw himself as called 'to follow in the footsteps of the Messenger and to communicate his message to all nations,' and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam." *Flanagan*, 87 F. Supp. 3d at 97–98 (citing *Rux*, 495 F. Supp. 2d at 48).

## B. The Bombing

At approximately 8:30 a.m. on October 12, 2000, the Cole entered the Port of Aden, Yemen, to refuel. *See Flanagan*, 87. F. Supp. 3d at 98 (citing *Rux*, 495 F. Supp. 2d at 544–45). The Navy used the Port of Aden as "the primary refueling stop for American ships during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea" since 1999. *Id.* As of October 2000, the Cole, an Arleigh Burke Class Destroyer, had a crew of twenty-six officers and 270 enlisted personnel. *See id.* It "was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months." *Id.* On the morning of the bombing,

> [a]t approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch.  The blast ripped a thirty-two-by thirty-six-foot hole in the port side . . . .  Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded.  Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed.  The blast and its after-effects killed seventeen Navy sailors, all of them American citizens.  Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

*Id.*  "The Cole plot was an Al Qaeda operation supervised directly by Bin Laden." *Rux*, 495 F. Supp. 2d at 552.

### C.  Sudan

While Sudan has been dismissed as a Defendant, the Court briefly summarizes relevant facts concerning its relationship with Al-Qaeda and Iran and its participation in the bombing of the Cole, as they provide relevant context for understanding Iran's role in the bombing.  "In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that overthrew the elected government and converted Sudan into an Islamic Arab state." *Flanagan*, 87 F. Supp. 3d at 98–99.  Hassan al Turabi, head of the Sudanese political party the National Islamic Front ("NIF"), orchestrated the coup, after which he was in power until late 1999. *Id.* at 99.  Bin Laden lived in Sudan from 1991 to 1996, during which time he "agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the country's infrastructure." *Id.*  "In exchange, Sudan provided Bin Laden's group with a sanctuary within which it could freely meet, organize, and train militants for future operations." *Id.*  The United States designated Sudan as a state sponsor or terrorism in 1993, but rescinded the designation effective December 14, 2020.  *See* Rescission of Determination Regarding Sudan, 85 Fed. Reg. 82565 (Dec. 18, 2020); *see also* Pls.' Unopposed Mot. for Vol. Dismissal of Defendant Republic of Sudan at 3, ECF No. 12.  "Al-Qaeda's time in Sudan from

1991 through 1996 was invaluable to the development of the terrorist organization," and even after it "was expelled from Sudan in 1996, Sudan continue[d] to be a safe harbor . . . allowing the organization to plan more freely." *Flanagan*, 87 F. Supp. 3d at 100–01 (quotation omitted).

### D.  Iran

Starting in the early 1990s, Iran and Sudan and Al-Qaeda began to coordinate "against their common enemies, the United States and Israel." *Flanagan*, 87 F. Supp. 3d at 103 (quotation and citations omitted). "Although Iranians are Shias, they nevertheless supported the terrorist activities of Bin Laden, a Suni, because of their mutual hatred of 'the infidels in the United States.'" *Id.* (citation omitted).[4]  This "tripartite front" allowed Al-Qaeda "the opportunity to build ties with Iranian officials, Hizballah, and other terrorist organizations dedicated to attacking United States personnel, military targets, and citizens in the Middle East." *Id.*  "[T]he parties agreed that 'experience from Hizballah and Iran should be transferred to new nations/extremist groups who lack this expertise . . . [in order to] allow [Al-Qaeda] members to gain the necessary experience in terrorist operations.'" *Id.* (citation omitted).  The United States designated Iran a state sponsor of terrorism in 1984, *see* U.S. Dep't of State, *Determination Pursuant to Section 69(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836 (Jan. 23, 1984), and the designation remains in place today, *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited March 16, 2023).

Iran often used "both its own people and facilities as well as those of its close ally Hizballah" to support terrorist operations, including Al-Qaeda.  *Flanagan*, 87 F. Supp. 3d at

---

[4] Iran's support for Al-Qaeda maintained "even in situations where Iran [was] also supporting those fighting Al-Qaeda."  *Flanagan*, 87 F. Supp. 3d at 105.

103–04 (internal quotation omitted).  "Iranian '[s]upport for militant and terrorist groups [was] almost always done via Iran's Ministry of Intelligence and Security (MOIS) or the Islamic Revolutionary Guard Corps (IRGC), a parallel military force that [was] tasked with protecting Iran's revolution at home and spreading it abroad, among other duties.'"  *Id.* (citation omitted). Iran "used its intelligence services extensively to facilitate and conduct terrorist attacks," and intelligence officers "used the diplomatic pouch for conveyance of weapons and finances for terrorist groups."  *Id.* (internal quotations omitted).  MOIS "facilitated the movement of [Al-Qaeda] operatives in Iran and provided them with documents, identification cards, and passports," and negotiated the release of its operatives.  *Id.*  Iran has provided training and "large sums of money" to Al-Jihad, "an Islamic terrorist group controlled by Bin Laden," and "intense secret contacts have taken place between top Iranian intelligence officers, Bin Laden, and Al-Zawaheri," one of Al Jihad's leaders.  *Id.* at 105 (citation omitted).  Furthermore, "Iran directly trained Al-Qaeda operatives," and also supported Hizballah, "which in turn provided training for Al-Qaeda."  *Id.* at 106.  Finally, "Iran has long provided material support to Al-Qaeda in the form of safe passage and facilitation of travel," including by "permit[ing] at least some Al-Qaeda members and leaders to cross Iranian territory, without stamping their passports" and by letting Al-Qaeda "establish a series of guest houses for its fighters making the long journey through [Iranian] territory."[5]  *Id.* at 107 (citation omitted).  Such travel assistance was "invaluable" in helping operatives to evade authorities, facilitating recruitment and training,

---

[5] Allowing passage through Iran without stamping operatives' passports "was very useful for al-Qaeda to pass through Iran in order to get to the outside world, because if they showed up with Pakistani visas on their passports, then the Saudis or United Arab Emirate authorities were suspicious."  *Flanagan*, 87 F. Supp. 3d at 107.

and simplifying communication and coordination "among the far-flung strands of the global

jihad of which [Al-Qaeda] is a part." *Id.* at 107–08 (citations omitted).

"At the time of the bombing of the Cole, the links between [Iran] and Bin Laden and

Al-Qaeda were firmly established." *Id.* at 108.  As the *Flanagan* court summarized:

> Iran was actively tied to al-Qa'ida in the years when the attack on USS Cole was being
> planned and when it was executed.  The 1999 State Department report on terrorism that
> year noted Iran's support in training and logistics for extremist groups like al-Qa'ida in
> the Gulf, among other activities.  Iran reportedly contributed to helping al-Qa'ida set up a
> network in Yemen: Zawahiri wrote to thank the Iranians for their assistance.  Ali Abdul
> Aziz Ali, identified as one of the USS Cole bombing masterminds, was radicalized in
> Iran after hearing Ramzi Yousef, who masterminded the 1993 World Trade Center
> bombing, speak about jihad there (the exact date is unclear).  Al-Qa'ida facilitator and
> financier Muhsin al-Fadhli is Iran-based and he helped finance the 2002 attack on MV
> Limburg off Yemen–many of those involved in Al Qaeda's [sic] operations in Yemen
> were also involved in the Limburg attack.  In addition, initial reports indicated the bomb
> used for the USS Cole attack bears similarities to shaped bombs designed by Hizballah,
> and it is possible that al-Qa'ida learned such techniques when training in Lebanon in the
> early 1990s.
> . . .
> Iran supported al-Qa'ida as an organization and made it stronger overall, and this made
> al-Qa'ida better able to carry out terrorist attacks such as the USS Cole bombing.  This
> support is not consistent or unqualified, but over the years it has helped make al-Qa'ida a
> formidable organization.

*Id.* (citation omitted).  "As a result of Iran's complicity, it is likely that Abd Rahim Hussayn

Muhammad al Nashiri, one of the masterminds of the attack on the Cole, travelled through Iran

when moving between Yemen and Afghanistan both before and after the bombing." *Id.*

### E.  Plaintiffs

Both Directly Injured Plaintiffs and Family Plaintiffs seek relief on a theory of IIED.  *See*

Compl. ¶¶ 6.1–6.3.  The twenty-five Directly Injured Plaintiffs seek pain and suffering damages

and the thirty-three Family Plaintiffs seek solatium damages.[6]  *See* Compl. at ¶ 71(c).  In

---

[6] Directly Injured Plaintiffs originally sought economic damages including "lost wages,
benefits and retirement pay, and other out-of-pocket expenses," Compl. at 36, but since withdrew
their request for such relief, *see* Ex. B to Pls.' Mot. at 2 n.1, ECF No. 19-2.

addition, Plaintiffs seek punitive damages, prejudgment interest, costs and expenses, and attorney's fees.  *See* Compl. at ¶ 71(d)–(g).  The injuries alleged by each Plaintiff are described *infra* Section IV.D.2.

### III.  LEGAL FRAMEWORK

#### A.  Default Judgment

Federal Rule of Civil Procedure 55 sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment.  *See* FED. R. CIV. P. 55; *see also Int'l Painters & Allied Trades Indust. Pension Fund v. Rose City Glass Co.*, 729 F. Supp. 2d 336, 338 n.3 (D.D.C. 2010) (citing FED. R. CIV. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)).  First, after a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter default against that defendant.  *See* FED. R. CIV. P. 55(a).  Second, following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, Rule 55(b)(2) permits the plaintiff to apply to the court for entry of default judgment.  *See* FED. R. CIV. P. 55(b)(2).  By providing for a two-step process, Rule 55 provides the defendant an opportunity to move the court to set aside the default before the court enters default judgment. *See* FED. R. CIV. P. 55(b)–(c).

Although entry of default judgment may at times be appropriate, it is "not automatic." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005)) (footnote omitted)).  Because "strong policies favor the resolution of disputes on their merits," the court "normally" must view the default judgment as "available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F.*

*Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)).  Even if a defendant appears "essentially unresponsive," *id.*, the court still has an "affirmative obligation" to ensure that it has subject matter jurisdiction over the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  The court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  "Although the plaintiffs retain 'the burden of proving personal jurisdiction,'" "[i]n the absence of an evidentiary hearing," plaintiffs can "satisfy that burden with a prima facie showing."  *Braun*, 228 F. Supp. 3d at 74 (internal quotation marks omitted) (quoting *Mwani*, 417 F.3d at 6–7).  To make the required prima facie showing, plaintiffs may rely on "their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain."  *Mwani*, 417 F.3d at 7.

## B.  Evidentiary Showing Required by the FSIA

A court addressing a FSIA claim can enter default judgment against a foreign state only if "the claimant[s] establish[] [their] right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").  This statutory standard mirrors the default judgment standard of Federal Rule of Civil Procedure 55(d).  *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 90 (D.D.C. 2019) (citing *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003)).  The "FSIA leaves it to the court to determine precisely how much and what kinds of evidence . . . plaintiff[s] must provide, requiring only that it be 'satisfactory to the court.'"  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir.

2014) (quoting 28 U.S.C. § 1608(e)).  A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in section 1605A of the FSIA: to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."  *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)).  In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus*, 750 F. Supp. 2d at 171). "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 94–95 (D.D.C. 2006)).

## IV.  ANALYSIS

Before considering liability or damages in a FISA case, the Court must first confirm it has subject matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Iran.[7]  *See Barry v. Islamic Republic of Iran ("Barry I")*, 410 F. Supp. 3d 161, 172 (D.D.C. 2019).  For the reasons set forth below, the Court finds that it has original jurisdiction over this suit pursuant to the FSIA, that it has personal jurisdiction over Iran, and that Plaintiffs have established liability and are entitled to damages.

---

[7] A limitations period applies to private actions brought under the FSIA's terrorism exception to foreign sovereign immunity.  *See* 28 U.S.C. § 1605A(b).  However, this statute of limitations is "not jurisdictional" and the Court "lack[s] authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations" on behalf of an entirely absent defendant. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108, 1114–15 (D.C. Cir. 2019).

## A. Subject Matter Jurisdiction

Subject to an adequate showing by Plaintiffs, the FSIA waives Iran's sovereign immunity and grants this Court subject matter jurisdiction over this suit.

### 1. Waiver of Sovereign Immunity

The pertinent jurisdictional question is whether the FSIA's "terrorism exception," 28 U.S.C. § 1605A, applies such that Defendant Iran—a foreign state—is "not entitled to immunity," 28 U.S.C. § 1330(a), and Plaintiffs may pursue their claims before this Court. *See Barry I*, 410 F. Supp. 3d at 172–73 (summarizing background sovereign immunity principles). The terrorism exception establishes "that a foreign state is not immune in 'any case' in which 'money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Id.* at 173 (quoting 28 U.S.C. § 1605A).  A plaintiff in a suit brought under the FSIA "'bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies,' whereupon, if the defendant fails to appear, 'jurisdiction attaches.'" *Id.* (quoting *Owens*, 864 F.3d at 784).  In addition, the terrorism exception applies only if two prerequisites are met: (1) the foreign state was designated as a "state sponsor of terrorism at the time of the act," and "remains so designated when the claim is filed," 28 U.S.C. § 1605A(a)(2)(A)(i)(I), and (2) the "claimant or the victim was" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States[] or . . . an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at the time of the act, 28 § 1605A(a)(2)(A)(ii).  *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL

3037868, at *3 (D.D.C. July 11, 2019).  The Court will first consider whether these threshold

requirements are met and then consider whether this suit falls within the terrorism exception's

waiver of sovereign immunity, thereby conferring subject matter jurisdiction.

a.  *Requirements for a Claim to be Heard Under Section 1605A*

The Court finds that section 1605A's prerequisites are met.  First, Iran was designated as

a state sponsor of terrorism in 1984, *see* U.S. Dep't of State, *Determination Pursuant to Section*

*69(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836 (Jan. 23, 1984), and has

remained so designated ever since, *see* U.S. Dep't of State, *State Sponsors of Terrorism*,

https://www.state.gov/state-sponsors-of-terrorism/ (last visited March 16, 2023).  Thus,

Plaintiffs' claims for injuries suffered as a result of the Cole bombing in 2000 satisfy the first

prerequisite under section 1605A(a)(2)(A)(i)(I).

Plaintiffs have also satisfied the second prerequisite under section 1605A(a)(2)(A)(i)(II).

Again, the terrorism exception applies only if the "claimant or victim was," at the time of the act,

a national of the United States, a member of the armed forces, or working as "an employee of the

Government of the United States" or "performing a contract awarded by the United States

Government" and, in either case, "acting within the scope of the employee's employment."

§ 1605A(a)(2)(A)(ii).  The Complaint alleges that each Plaintiff is a U.S. Citizen, and Directly

Injured Plaintiffs submitted supplemental declarations attesting to their citizenship status and the

citizenship status of the Family Plaintiffs to whom they are related.  *See* Compl. ¶¶ 3.1–3.75;

Exs. DD–CCC to Suppl. Mem., ECF Nos. 20-3–20-28.  The Court accepts Plaintiffs' claims to

U.S. citizenship, which are supported by photographic and documentary proof.  Thus, all

Plaintiffs have met the threshold requirements for a claim to be heard under section 1605A.

b.  *Section 1605A's Waiver of Sovereign Immunity*

With these threshold requirements met, the next jurisdictional question is whether Plaintiffs have met each of the requirements enumerated in section 1605A itself.  "[A]n exception to sovereign immunity exists for a foreign defendant when the FSIA claimant seeks [1] 'money damages' [2] 'against a foreign state' for [3] 'personal injury or death that [4] was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'"  *Barry I*, 410 F. Supp. 3d at 174 (quoting 28 U.S.C. § 1605A(a)(1) (alterations added)); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi III*"), 879 F. Supp. 2d 44, 50–51 (D.D.C. 2012); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 32 (D.D.C. 2012).  Each of these prongs is met here.  Because Plaintiffs seek money damages in the form of compensatory and punitive damages against Defendant Iran, *see* Compl. ¶ 7.1; Proposed Damages Chart, Ex. CC to Suppl. Mem. at 2 n.1, ECF No. 20-2,[8] prongs one and two are satisfied.  Regarding prong three, the Court finds "satisfactory evidence" of Plaintiffs' personal injuries in their affidavits and supporting documentation, as summarized *infra* Section IV.D.2, which lay out in detail all manor of physical injuries suffered by Directly Injured Plaintiffs, as well as the follow-on emotional injuries suffered by all Plaintiffs.  28 U.S.C. § 1608(e); *see Barry I*, 410 F. Supp. 3d at 174 ("Plaintiffs' pleadings and declarations . . . satisfy prong three").  Regarding prong four, Plaintiffs' pleadings and the attached affidavits and supporting materials establish that the Cole bombing caused these injuries.  *See, e.g.*, Medical Progress Notes for Michael Proctor, Ex. E to Pls. Mot. at 9 ("This patient . . . sustained

---

[8] Plaintiffs resubmitted their proposed damages chart to correct errors in the originally submitted version (Ex. B to Pls.' Mot.).  *See* Suppl. Mem. at 4, ECF No. 20.  The Court relies on the updated chart (Exhibit CC to Plaintiff's Supplement (Ex. CC to Suppl. Mem.).  The Court hereinafter refers to the updated chart with the name "Proposed Damages Chart."

significant trauma in October 2000 when he was a member aboard the USS Cole and was injured

during an explosion causing injury to his lower back as well as his left knee.").  Finally,

regarding prong five, the Court adopts the finding from *Flanagan* that Iran, "through the

provision of material support and resources (the financial support, support for training, and

facilitation of travel) to Bin Laden and Al-Qaeda, facilitated the planning and execution of the

attack on the Cole," *Flanagan*, 87 F. Supp. 3d at 115; *see* 28 U.S.C. § 1605A(h)(3) (providing, in

relevant part, that "'material support or resources' means any property, tangible or intangible, or

service" (referencing 18 U.S.C. § 2339A)).

  Accordingly, all of section 1605A's subject matter jurisdictional requirements are met,

and Iran's sovereign immunity is waived with respect to Plaintiffs' claims.

### B.  Personal Jurisdiction

  The Court next explores whether Plaintiffs have met the FSIA's separate procedural

requirements regarding personal jurisdiction.  "Personal jurisdiction exists over a non-immune

sovereign so long as service of process has been made under section 1608 of the FSIA."  *Estate*

*of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 255 (D.D.C. 2006)

(citation omitted); 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign state shall exist as

to every claim for relief over which the district courts have jurisdiction . . . where service has

been made under section 1608 of this title.").  Section 1608 provides four ways to effect service:

[1] "special arrangement for service between the plaintiff and the foreign state or political

subdivision;" [2] "in accordance with an applicable international convention on service of

judicial documents;" [3] in cases where the first two methods do not suffice to effect service, "by

sending a copy of the summons and complaint and a notice of suit" including translations "into

the official language of the foreign state, by any form of mail requiring a signed receipt, to be

addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of

the foreign state concerned," or [4] if the third method also fails,

> by sending two copies of the summons and complaint and a notice of suit,
> together with a translation of each into the official language of the foreign state,
> by any form of mail requiring a signed receipt, to be addressed and dispatched by
> the clerk of the court to the Secretary of State in Washington, District of
> Columbia, to the attention of the Director of Special Consular Services—and the
> Secretary shall transmit one copy of the papers through diplomatic channels to the
> foreign state and shall send to the clerk of the court a certified copy of the
> diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

Neither option one nor option two applies here, as Plaintiffs do not have a "special

arrangement with Iran" and there is no "applicable international convention."  *See* Pls.' Mot. at

4, 7.  Plaintiffs therefore attempted to effectuate service using the third method.  *See* Aff. Req.

Foreign Mailing, Aug. 20, 2020, ECF No. 5.  This attempt was unsuccessful, so Plaintiffs

resorted to the fourth method, *see* Aff. Req. Foreign Mailing, Nov. 25, 2020, ECF No. 7;

Certificate of Mailing, Dec. 1, 2020, ECF No. 9, under which service was effected on the Iran

Ministry of Foreign Affairs on May 11, 2021, *see* Return of Serv., June 3, 2021, ECF No. 14.

Thus, Plaintiffs have satisfied section 1608's service of process requirements, and the Court may

exercise personal jurisdiction over Iran.

### C.  Liability

With the jurisdictional inquiry settled, the Court turns to the question of liability.

"[A]lthough section 1605A creates a private right of action for claimants who meet its other

requirements, a FSIA plaintiff must further prove a theory of liability to establish a claim for

relief that entitles them to damages."  *Barry I*, 410 F. Supp. 3d at 176 (cleaned up); *see also*

*Owens*, 864 F.3d at 807 ("[T]he question [of] whether a statute withdraws sovereign immunity is

'analytically distinct' from whether a plaintiff has a cause of action." (citing *FDIC v. Meyer*, 510

15

U.S. 471, 484 (1994); *United States v. Mitchell*, 463 U.S. 206, 218 (1983))).[9]  Plaintiffs who

seek relief in section 1605A actions "'generally' turn to 'the lens of civil tort liability'" to

articulate the "justification for such recovery."  *Barry I*, 410 F. Supp. 3d at 176 (quoting *Rimkus*,

750 F. Supp. 2d at 175–76); *see also, e.g.*, *Schertzman Cohen*, 2019 WL 3037868, at *5

(discussing *Valore* and *Rimkus*).  "Based on the D.C. Circuit's guidance, district courts in this

jurisdiction 'rely on well-established principles of law, such as those found in the Restatement

(Second) of Torts . . . ' to define the elements and scope of these theories of recovery."  *Worley*

*v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) (quoting *Oveissi v. Islamic*

*Republic of Iran (Oveissi III)*, 879 F. Supp. 2d 44, 54 (D.D.C.2012)); *see also Fraenkel v.*

*Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) (citing *Bettis v. Islamic Republic of*

*Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003)) ("The courts are not authorized to craft a body of

federal common law in deciding FSIA terrorism exception cases.  However, a district court may

rely on well-established statements of common law . . . . ").

> Here, Directly Injured Plaintiffs and Family Plaintiffs seek relief for IIED.[10]  *See* Compl.

¶¶ 6.1–6.3.  "Under general principles of tort law, a defendant is liable for IIED if its 'extreme

---

[9] As indicated in the Court's jurisdictional analysis *supra* Section IV.A.1.a, all Plaintiffs have demonstrated that they are United States citizens.  As "national[s] of the United States," they are eligible to bring suit under the private right of action established under 18 U.S.C. § 1605A(c).

[10] While Plaintiffs further claim solatium, *see* Compl. ¶ 6.4, "the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues," *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976).  Still, because "[s]olatium claims under the FSIA are functionally identical to claims for [IIED]," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014), solatium damages are reflected in the compensatory damages awards laid out below.  *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 47 n.12 (D.D.C. 2012) (explaining that while the spouses of the injured plaintiffs allege solatium in addition to IIED, because the two are "indistinguishable" the court "considers the IIED claim and awards appropriate damages (also known a[s] 'solatium damages') . . . . "), *reversed on other grounds by Republic of Sudan v. Harrison*, 139 S. Ct. 1048 (2019).

and outrageous conduct intentionally or recklessly causes severe emotional distress' to a plaintiff." *Barry I*, 410 F. Supp. 3d at 177 (citing RESTATEMENT (SECOND) OF TORTS § 46(1)). "In terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived." *Flanagan*, 87 F. Supp. 3d at 115 (citing *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010)).

Having reviewed the evidence presented in *Flanagan*, *see Rimkus*, 750 F. Supp. 2d at 171–72, the Court agrees with its finding that satisfactory evidence establishes that Iran's provision of financial, training, and travel support to Bin Laden and Al-Qaeda "facilitated the planning and execution of the attack on the Cole." *See Flanagan*, 87 F. Supp. 115–16; *see also Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 25 (D.D.C. 2014) (taking judicial notice of evidence from previous case concerning the same bombing to establish liability). The intent requirement is also met because "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C.2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C.2002)). In addition, Plaintiffs' affidavits and supplementary materials constitute satisfactory evidence that they in fact suffered severe emotional distress. *See infra* Section IV.D.2. Thus, applying general IIED tort law principles in the FSIA context, the Court concludes that Plaintiffs have established Iran's liability.

### D. Damages

"The FSIA's private cause of action permits plaintiffs to seek 'economic damages, solatium, pain and suffering, and punitive damages.'" *Barry I*, 410 F. Supp. 3d at 179 (quoting

28 U.S.C. § 1605A(c)).[11]  Plaintiffs seek compensatory and punitive damages with prejudgment

interest.  *See* Compl. ¶¶ 6.1–6.4, 7.1; Proposed Damages Chart.

### 1.  Compensatory Damages under the FSIA

As other courts addressing similar suits under the FSIA have observed, "it is undeniably

difficult to assess the amount of compensatory damages for the pain and suffering of surviving

victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v.*

*Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010) (internal quotation marks omitted)

(quoting *Brewer*, 664 F. Supp. 2d at 57).  Because of the importance of ensuring "that

individuals with similar injuries receive similar awards," *Peterson v. Islamic Republic of Iran*,

515 F. Supp. 2d 25, 54 (D.D.C. 2007), courts in this jurisdiction confronting FSIA claims have

developed a framework for the calculation of compensatory damages, *see Valore*, 700 F. Supp.

2d at 83–84.  Although the so-called *Heiser* framework, first set forth in *Heiser I*, 466 F. Supp.

2d 229, is non-binding, it provides baseline figures and a basic methodology by which to

ascertain the "appropriate measure of damages" both for directly injured victims and for "the

family members of victims who died" or were injured in a terrorist attack.  *Lelchook III*, 2019

WL 4673849, at *4 (quoting *Peterson*, 515 F. Supp. 2d at 51, 54); *see also, e.g.*, *Valore*, 700 F.

Supp. 2d at 85–86 (noting "strong precedential support" for the framework); *Brewer v. Islamic*

---

[11] The FSIA requires plaintiffs to make an adequate evidentiary showing before a court may award damages: "To obtain damages against defendants in a FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of the damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill*, 328 F.3d at 681); *see also Wultz*, 864 F. Supp. 2d at 37.  For the reasons discussed previously, Plaintiffs have established that Iran intended to injure the sailors aboard the Cole when it provided material support and resources to Bin Laden and Al-Qaeda.  Thus, Plaintiffs have carried their burden to show that the consequences of Iran's act were reasonably certain, and the sole question for this Court is the damages amount.

*Republic of Iran*, 664 F. Supp. 2d 43, 57–58 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d  20, 27 n.4 (D.D.C. 2009).

Under the *Heiser* framework, a court begins with baseline amounts and may adjust upward or downward to account for individual circumstances.  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . "  *Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011).  For a directly injured claimant, "[c]ourts generally 'begin[] with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages.'"  *Barry I*, 410 F. Supp. 3d at 180 (quoting *Wultz*, 864 F. Supp. 2d at 37–38).  An upward adjustment to the $7 to $12 million range may be appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead."  *Valore*, 700 F. Supp. 2d at 84.  Conversely, a downward departure to the $1.5 million to $3 million range may be appropriate "where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,' or 'severe emotional injury accompanied by relatively minor physical injuries.'"  *Barry I*, 410 F. Supp. 3d at 180 (first quoting *Valore*, 700 F. Supp. 2d at 84, then quoting *Estate of Doe v. Islamic Republic of Iran* ("*Estate of Doe II*"), 943 F. Supp. 2d 180, 186 (D.D.C. 2013)).  Awards for physical injuries "assume severe psychological injuries."  *Schertzman Cohen*, 2019 WL 3037868, at *6 (citing *Wamai*, 60 F. Supp. 3d at 92–93).

For family member claimants, the relationship between the victim and the family member who seeks relief determines the baseline amount of the award.  *See Peterson*, 515 F. Supp. 2d at 51.  As a starting point, the family of a deceased victim typically receives damages in the amount

19

of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling.  *See*

*Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at \*74 (D.D.C. June

27, 2019) (citing *Valencia*, 774 F. Supp. 2d at 15).  These amounts are halved for the family of

an injured victim, with courts generally awarding $4 million to a spouse, $2.5 million to a child

or parent, and $1.25 million to a sibling.  *Id.*

An upward adjustment may be appropriate "in cases 'with aggravating circumstances,'

indicated by such things as '[t]estimony which describes a general feeling of permanent loss or

change caused by decedent's absence' or '[m]edical treatment for depression and related

affective disorders.'"  *Valore*, 700 F. Supp. 2d at 85–86 (first quoting *Greenbaum*, 451 F. Supp.

2d at 108, then quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998)).

Whether such an adjustment is in order is a fact-specific inquiry that "cannot be defined through

models and variables."  *Fraenkel*, 892 F.3d at 356–57 (quoting *Flatow*, 999 F. Supp. at 30).  In

parsing the relevant facts, a district court is to bear in mind that "past solatium awards from

comparable cases are appropriate sources of guidance," but "different plaintiffs (even under

FSIA) will prove different facts that may well (and should) result in different damage awards."

*Id.* at 362 (citation and internal quotations omitted); *see also Schooley*, 2019 WL 2717888, at

\*77 (citing *Fraenkel*, 892 F.3d at 362).

## 2.  Compensatory Damages Awards

In summary, the base award for each Directly Injured Plaintiff is $5 million and the base

award for each Family Plaintiff is $4 million to a spouse, $2.5 million to a child or parent, and

$1.25 million to a sibling, subject to the adjustments based on the Plaintiff-specific facts set forth

below.[12]  In general, and consistent with the framework outlined above, the Court has made

downward adjustments to Directly Injured Plaintiffs' pain and suffering damage awards where

no physical injury was alleged, with the magnitude of that adjustment subject to specific factual

allegations about the disabling consequences of the emotional injuries.  Conversely, the Court

has made upward adjustments to Directly Injured Plaintiffs' pain and suffering damage awards

based on the number and severity of the physical and emotional injuries suffered.  In all cases,

the Court placed added weight on disability ratings assigned by objective medical professionals

at the Department of Veterans Affairs (the "VA"), as indicated in Plaintiffs' submissions.  *See*

30 C.F.R. § 4.10 (explaining that "medical examiner[s]" base disability evaluations on "the

ability of the body as a whole, or of the psyche, of a system or organ of the body to function

under the ordinary conditions of daily life including employment" using "etiological, anatomical,

pathological, laboratory, and prognostic data required for ordinary medical classification");

*Schooley*, 2019 WL 2717888, at *74 ("The VA disability rating, which includes both mental and

physical injuries in a single number, facilitates an approach to awarding damages that is

generally agnostic to the mental or physical nature of the injury and further provides a relatively

objective measure of comparative injuries among [plaintiffs].").  With respect to Family

Plaintiffs, the Court has made upward adjustments to solatium damage awards where the family

members themselves suffered mental health consequences from the injuries suffered by the

Directly Injured Plaintiff to whom they are related.  With that said, before listing Plaintiffs'

injuries and awards below, the Court acknowledges that the cold assignment of a number value

---

[12] Directly Injured Plaintiffs are listed in the umbrella paragraphs, while Family Plaintiffs are listed in the indented paragraphs underneath the Directly Injured Plaintiff to whom they are related.

to Plaintiffs' injuries cannot "perfectly reflect the measure of individual suffering." *Barry I*, 410

F. Supp. 3d at 180.

1.  <u>Chief Petty Officer Sean Taitt</u>:  Stationed aboard the Cole, Plaintiff Sean Taitt was on the "third deck below the water directly in the path of the blast" on the day of the bombing.  Compl. ¶ 3.1.  He suffered a dislocated left leg requiring surgery, a fractured left shoulder requiring surgery, shrapnel wounds to his left eye requiring surgery, and shrapnel removal scars near his left eye.  Sean Taitt Aff., Ex. C to Pls.' Mot. at 4, ECF No. 19-3.[13]  He has chronic pain in his left shoulder and on the left side of his face and his left leg, and suffers from Post-Traumatic Stress Disorder ("PTSD") and a Traumatic Brain Injury ("TBI").  *Id.*  The VA rates his PTSD and TBI as 70% disabling, his post-surgical left leg as 10% disabling, his post-surgical left shoulder as 20% disabling, and his post-shrapnel scars as 30% disabling.  *Id.*[14]  In light of these facts, the Court finds that Plaintiff Sean Taitt is entitled to an upward adjustment to $7 million in pain and suffering damages.

2.  <u>Senior Chief Petty Officer Craig Freeman</u>:  Stationed aboard the Cole at the time of the bombing, Plaintiff Craig Freeman suffered two ruptured ear drums resulting in hearing loss and requiring surgery, post-blast Tinnitus resulting in ear ringing and pain, fractured right elbow requiring surgery, fragment wounds to his left eye, hot water and oil burns, a TBI resulting in headaches, General Anxiety Disorder, and back pain.  *See* Craig Freeman Aff., Ex. D to Pls.' Mot. at 6, ECF No. 19-4.  The VA rates his TBI and anxiety disorder as 40% disabling, his elbow as 10% disabling, and his Tinnitus as 10% disabling.  *Id.* at 6, 86.  In light of these facts, the Court finds that Plaintiff Craig Freeman is entitled to an upward adjustment to $6 million in pain and suffering damages.

    i.  <u>Mary Ousley</u>:  The mother of Plaintiff Craig Freeman, Plaintiff Mary Ousley states that her son "changed after the bombing."  Mary Ousley Aff., Ex. D to Pls.' Mot. at 11.  She states that he "gets a little short with us sometimes, his temper flairs sometimes, and his [*sic*] is very verbal in expressing his disagreements with you."  *Id.*  In light of these facts, Plaintiff Mary Ousley is entitled to the base award of $2.5 million in solatium damages.

    ii.  <u>Maia Freeman</u>:  The adult daughter of Plaintiff Craig Freeman, Plaintiff Maia Freeman, who was four years old at the time of the Cole bombing, states that the bombing "had a huge impact on [her] family."  Maria Freeman Aff., Ex. D to Pls.' Mot. at 8.  She states that "[e]motionally, it has been a lot knowing how my father had to suffer, and the emotional trauma he still carries with

---

[13] For consistency, the Court cites to page numbers automatically generated through the electronic filing system when it refers to Plaintiffs' affidavits and supporting materials.

[14] The Complaint alleges that the VA rates Plaintiff Sean Taitt as "100% disabled," *see* Compl. ¶ 3.1, but the Court relies on the more recent and detailed allegations in his affidavit, which are supported by his VA health records, *see* Sean Taitt Aff. at 97.

him." *Id.* She states that the family can "still sense his emotional pain around the attack" and that, "[e]specially in the month of October every year . . . there's a change in him." *Id.* She says that people "are always interested in knowing what happened," and it is "always hard, having to relive the details of what [her] father endured on that ship." *Id.* She concludes that "it has been a lot emotionally and mentally, and will continue to be, because the Cole attack will never leave [her] family." *Id.* In light of these facts, Plaintiff Maia Freeman is entitled to the base award of $2.5 million in solatium damages.

iii.  <u>Angela Brown</u>:  The sister of Plaintiff Craig Freeman, Plaintiff Angela Brown states that she was "traumatized" after learning of the Cole bombing, "held hostage for two days" by the "unknow[n] and the possibilities" until she learned about her brother's health condition.  Angela Brown Aff., Ex. D to Pls.' Mot. at 13.  She states that she was "numb and disorient[ed]" and "could not sleep or eat" while she waited for an update.  *Id.*  She "lost weigh[t] and suffered a panic attack."  *Id.*  She states that the "long-term impact of the trauma" her brother suffered "is so ever present," as "before the bombing he was a very sensitive person, relaxed and easy going," but "now he's just the opposite."  *Id.*  Born in October herself, Plaintiff Angela Brown says "it has not been the same since 2000," as "[e]ach year [she is] sadden [*sic*] because of the lost [*sic*] of [the] brother [she] knew and the lives of so many other people."  *Id.*  In light of these facts, Plaintiff Angela Brown is entitled to the base award of $1.25 million in solatium damages.

iv.  <u>Abigail Prather</u>:  The sister of Plaintiff Craig Freeman, Plaintiff Abigail Prather states that, upon hearing of the bombing, she "started to cry," her "heart started beating rapidly," and she "became lightheaded."  Abigail Prather Aff., Ex. D to Pls.' Mot. at 14.  Over the days until she learned of her brother's condition, she "barely slept or ate" and "suffered with headaches and anxiety."  *Id.*  She states that the trauma her brother experienced in the Cole bombing "changed [his] life."  *Id.*  She "remember[s] how patient, how gentle and understanding he used to be," but "[n]ow he is less gentle, he has a short patience, and he shows aggression instead of understanding others [*sic*] point of view during family conversations."  *Id.*  In light of these facts, Plaintiff Abigail Prather is entitled to the base award of $1.25 million in solatium damages.

v.  <u>Veronica Reese</u>:  The sister of Plaintiff Craig Freeman, Plaintiff Veronica Reese states that the day she learned of the Cole bombing was "the most horrifying day of [her] life."  Veronica Reese Aff., Ex. D to Pls. Mot. at 16.  She states that her brother "says he will never forget that day" and that she "never want[s] to have to endure that kind of pain again." *Id.* at 17.  In light of these facts, Plaintiff Veronica Reese is entitled to the base award of $1.25 million in solatium damages.

3. <u>Petty Officer Third Class Michael Proctor</u>:  Stationed aboard the Cole, Plaintiff Michael Proctor was knocked unconscious by shrapnel when the bomb exploded. Compl. ¶ 3.8.  He regained consciousness buried under the dead bodies of fellow sailors, which nearby sailors helped remove so that he could get up.  *Id.*  Because of the bombing, Plaintiff Michael Proctor suffers from a chronic lower back pain caused by hitting a steel water door and steel pipe during the explosion, a left knee injury requiring surgery, bronchial asthma, and chronic PTSD.  Michael Proctor Aff., Ex. E to Pls.' Mot. at 3, ECF No. 19-5.  The VA rates his back injury as 40% disabling, his left knee as 10% disabling, his asthma as 30% disabling, and his PTSD as 70% disabling.  *Id.*  In light of these facts, Plaintiff Michael Proctor is entitled to an upward adjustment to $7 million in pain and suffering damages.

4. <u>Postal Clerk Second Class Isadore Sims</u>:  Stationed aboard the Cole, Plaintiff Isadore Sims at the time of the bombing was located on the mess deck, which put him directly by the explosion.  Compl. ¶ 3.9.  He suffered severed spinal tissue that caused an early end to his Naval career and PTSD.  Isadore Sims Aff., Ex. H to Pls.' Mot. at 4; ECF No. 19-8.  The VA rates his PTSD as 70% disabling.  *Id.*  In light of these facts, Plaintiff Isadore Sims is entitled to an upward adjustment to $6 million in pain and suffering damages.

    i. <u>Alexander Sims</u>: The adult son of Plaintiff Isadore Sims, Plaintiff Alexander Sims states that the injuries sustained by his father in the Cole bombing "altered [Alexander's] life and relationship with [his father] forever." Alexander Sims Aff., Ex H. to Pls.' Mot. at 7.  Alexander, who was two years old at the time of the bombing, states that he was "never able to do anything a normal child would love to do with their father because he was always in pain and therefore had to sit out and miss out on 'normal' family activities." *Id.*  In addition, his father's PTSD "wouldn't allow him to engage in activities that were important to [Alexander] at various times in [Alexander's] life, such as playing video games and watching certain movies and shows." *Id.*  Along the same lines, Alexander states that his father's PTSD "also kept him from enjoying himself during important life events shared between [Alexander], [his father], [their] family, and friends, like weddings, and important school milestones." *Id.*  He states that his father "was and is still extremely distant sometimes, leaving [him] without the person [he] needs most to guide [him] at integral moments in [his] life." *Id.*  Alexander states that his relationship with his father "was consistently hindered by his [father's] emotional/mental and physical limitations." *Id.*  In light of these facts, Plaintiff Alexander Sims is entitled to the base award of $2.5 million in solatium damages.

    ii. <u>Taebryanna Sims</u>: The adult daughter of Plaintiff Isadore Sims, Plaintiff Taebryanna Sims states that, while she is "uncomfortable detailing some of [her] personal experiences with [her] father," the "Cole Bombing of 2000 affected [her] father and in turn affected his parenting and [her] upbringing." Taebryanna Sims Aff., Ex. H to Pls.' Mot. at 5.  Taebryanna, who was five years old at the time of the bombing, says that her father had "quirks that [her]

other friend's [*sic*] fathers did not seem to possess," like an aversion to entering stores and a need to sit facing the door at restaurants. *Id.* In addition, she and her brother Alexander "had to manage [their] documentation in a way that other children did not even think of," for example having to go to the Social Security Office alone on a day off from school to request a new Social Security card. *Id.* She understands these qualities as a product of her father's "hyper-vigilance in the years after the bombing." *Id.* at 6. She says she "needed to take the lead in [her] care" and that she had to "grow up faster than [she] should have." *Id.* In sum, she states that she "didn't have a normal childhood because of [her father's] fears and behaviors." *Id.* In light of these facts, Plaintiff Taebryanna Sims is entitled to the base award of $2.5 million in solatium damages.

5. <u>Petty Officer Third Class Sheila Cooper</u>: Stationed aboard the Cole, Plaintiff Sheila Cooper had just finished walking through the lunch line when the explosion knocked her against a wall, causing her to forcefully hit her head. Compl. ¶ 3.12. She suffers from head pain, PTSD resulting in insomnia, nightmares, panic attacks, and increased alcohol consumption, Major Depressive Disorder, and post-traumatic headaches. Sheila Cooper Aff., Ex. L to Pls.' Mot. at 5, ECF No. 19-12. The VA rates her PTSD as 70% disabling. *Id.* In light of these facts, Plaintiff Sheila Cooper is entitled to the base award of $5 million in pain and suffering damages.

   i. <u>Lynell Cooper</u>: The sister of Plaintiff Sheila Cooper, Plaintiff Lynell Cooper describes the day of the Cole bombing as the "most horrifying day" of her life. Lynell Cooper Aff., Ex. L. to Pls.' Mot. at 6. She was unable to work that day or sleep that night. *Id.* After the bombing, she says that Sheila's "spontaneous bright smile had turned into just a forced parting of the lips." *Id.* at 7. She "could tell that Sheila was in a lot of emotional pain and [she] shared that pain with her." *Id.* For example, when Sheila had "nightmares where she would cry out in fear," Lynell would stay awake and check on her. *Id.* She says that, recently, they looked at an old newspaper article about the Cole bombing, and Sheila started to cry, which was "very painful for [Lynell] to witness." *Id.* In light of these facts, Plaintiff Lynell Cooper is entitled to the base award of $1.25 million in solatium damages.

6. <u>Navy Serviceman Rodney Jackson</u>:[15] Stationed aboard the Cole, Plaintiff Rodney Jackson was on watch on the quarterdeck at the time of the bombing. *See* Compl. ¶ 3.14. Reverberations from the explosion caused hot oil and water to spill onto his head and face. *Id.* A water tank door also hit his knee and he was slammed against a wall. *Id.* He suffered scalp burns resulting in "keloidosis capitis," a right knee strain causing right knee pain, a lower back injury requiring surgery, PTSD resulting in sleep impairment, Anxiety Disorder, Depressive Disorder, and hypertension secondary to PTSD. Rodney Jackson Aff., Ex. G to Pls.' Mot. at 3, ECF No. 19-7. The VA rates his keloidosis capitis as 10% disabling, his lower back as 20%

---

[15] Plaintiff Rodney Jackson's rank was not specified in the Complaint.

disabling, his PTSD with sleep impairment as 70% disabling, and his hypertension as 10% disabling. *Id.* In light of these facts, Plaintiff Rodney Jackson is entitled to an upward adjustment to $6.5 million in pain and suffering damages.

i. <u>Diquan Jackson</u>: The adult son of Plaintiff Rodney Jackson, Plaintiff Diquan Jackson says the uncertainty about his father's condition in the immediate aftermath of the bombing was "devastating." Diquan Jackson Aff., Ex. G. to Pls.' Mot. at 4. Diquan, who was six years old at the time of the bombing, says that "once [his] dad arrived back home stateside, [he] saw a different man inside of him." *Id.* Diquan "could see that things had changed in [his] dad's life, and he was not as outgoing as he was before with [the family]." *Id.* Diquan states that he and his siblings wanted to take their father out sometimes, but that he "did not like to leave home as often as before" due to "PTSD issues." *Id.* at 4–5. Even when did spend time together, "it was not the same at all." *Id.* at 5. He states that his father "is still dealing with some after thoughts and PTSD issues" and that the "bombing definitely has taken a lot out of him mentally and physically." *Id.* In light of these facts, Plaintiff Diquan Jackson is entitled to the base award of $2.5 million in solatium damages.

ii. <u>Jacquez Jackson</u>: The adult son of Plaintiff Rodney Jackson, Plaintiff Jacquez Jackson, who was an infant at the time of the Cole bombing, states that after his father "retired and tried to adjust to normal life and working again, he struggled with memory issues and had bad dreams more often than ever." Jacquez Jackson Aff., Ex. G to Pls.' Mot. at 6. Jacquez states that while he remembers his father used to be "the type of father that took [him and his brother] out to parks to play and dinner outings with the family," "[a] lot of that changed as time went by, as he would rather just always stay at home and not leave the house, because he did not want to be around a lot of people no matter where we went." *Id.* He says that he "definitely saw the change in [his] father that things were not right for him after the ship bombing and it reflected on [the] family." *Id.* He states that his father "continues to try and downplay" the consequences of the Cole attack, but that the "the bombing has definitely took [*sic*] a toll on [him]." *Id.* at 6–7. In light of these facts, Plaintiff Jacquez Jackson is entitled to the base award of $2.5 million in solatium damages.

iii. <u>Tiffany Major</u>: The adult daughter of Plaintiff Rodney Jackson, Plaintiff Tiffany Major states that, "the bombing took a lot of" her father. Tiffany Major Aff., Ex. G to Pls.' Mot. at 8. After the bombing, she says that her father "was going through some good and bad moments and things eventually changed in his life and we could all notice it." *Id.* Tiffany, who was sixteen years old at the time of the bombing, says that her "dad was always an outgoing person, but he did not like to be gone for long periods of the day or even be away from home after the bombing." *Id.* He had "bad thoughts that would occur involving the bombing but tried to overlook those issues." *Id.* at

9.  In light of these facts, Plaintiff Tiffany Major is entitled to the base award of $2.5 million in solatium damages.

7.  <u>Petty Officer First Class Marlon O'Neil</u>:  Stationed aboard the Cole, Plaintiff Marlon O'Neil was in the ship's administration office emailing his family at the time of the bombing.  *See* Compl. ¶ 3.18.  While he was eventually able to take shelter in the General Quarters station, *see id.*, he was knocked unconscious after being thrown out of his chair and into a wall by the force of the explosion, *see* Marlon O'Neil Aff., Ex. J to Pls.' Mot. at 4, ECF No. 19-10.  He suffers from post-traumatic migraines with tension headaches and PTSD resulting in insomnia, nightmares, anxiety, depression, and hypervigilance.  *See id.*  The VA rates his migraines as 50% disabling and his PTSD as 50% disabling.  *Id.*  In light of these facts, Plaintiff Marlon O'Neil is entitled to the base award of $5 million in pain and suffering damages.

   i.  <u>Franklin O'Neil</u>:  The father of Plaintiff Marlon O'Neil, Plaintiff Franklin O'Neil states that "[w]hen Marlon came home after the tragic attack, that sole event changed him in a way that neither of his family nor I knew how to help him deal with."  Franklin O'Neil Aff., Ex. J to Pls.' Mot. at 7.  He says that "[a]s a father, the worst feeling is not knowing how to help your child."  *Id.*  He found that his son was "physically there with [them] but he was not emotionally or mentally there," and "that made [him] second-guess [himself] as his father."  *Id.*  Franklin states that he "began to deal with a host of different mental and emotional issues as a result."  *Id.*  He describes how his son was "once an upbeat young man, but that part of him was taken away on that tragic day."  *Id.*  In light of these facts, Plaintiff Franklin O'Neil is entitled to the base award of $2.5 million in solatium damages.

   ii.  <u>Deloris O'Neil</u>:  The mother of Plaintiff Marlon O'Neil, Plaintiff Deloris O'Neil states that the Cole bombing "took a lot out of [her] mentally and physically."  Deloris O'Neil Aff., Ex. J to Pls.' Mot at 9.  After Marlon returned home, Deloris says she "noticed a drastic change in his demeaner," including that he was "very standoffish, jittery, unable to sleep, and he could not be around loud noises."  *Id.*  She witnessed him "break down in tears" after hearing a loud noise.  *Id.*  She says the attack took a "toll on him socially, psychologically, emotionally, and physically," and that he is no longer the "happy go lucky person, speaking and talking to anyone that he met," that he once was.  *Id.*  In light of these facts, Plaintiff Deloris O'Neil is entitled to the base award of $2.5 million in solatium damages.

8.  <u>Petty Officer Second Class Donna Green</u>:  Stationed aboard the Cole, Plaintiff Donna Green was cleaning lockers in her workspace on the starboard side of the ship at the time of the bombing.  *See* Compl. ¶ 3.22.  The explosion knocked her unconscious.  *Id.*  She suffers from post-traumatic headaches, Major Depressive Disorder, and PTSD resulting in insomnia, nightmares, anxiety, and guilt.  Donna Green Aff., Ex. Q to Pls.' Mot. at 4, ECF No. 19-17.  The VA rates her PTSD as 70% disabling.  *Id.*  In

light of these facts, Plaintiff Donna Green is entitled to the base award of $5 million in pain and suffering damages.

      i.  <u>Jakari Green</u>:  The adult daughter of Plaintiff Donna Green, Plaintiff Jakari Green, who was five years old at the time of the Cole bombing, says that "one of [her] first memories was standing in front of the television at [her] grandmother's house watching America go under attack in October of 2000." Jakari Green Aff., Ex. Q to Pls.' Mot. at 5.  She says that she "would never have though that both [her] and [her] mother's lives would be forever different."  *Id.*  In the years after the bombing, her mother "began having panic attacks and night terrors as she recalled the moments leading up to the attack."  *Id.*  Donna would wake up screaming in the night and "run to [Jakari's] room to lay with [her] for comfort."  *Id.*  s

Jakari says that she "know[s] for a fact that [she] has developed some of [her] mother's symptoms of PTSD, because [she] still get extremely anxious when someone is either very loud or screams."  *Id.*  She says that "due to [her] mother's fear, [she] was restricted from a lot of things growing up, and not allowed to do most of the things [her] peers were able to do."  *Id.* at 6.  She "didn't realize how much [her] mother's near death experience affected [her] as an adult until about 2015," when she "began to experience symptoms that aligned with dissociative identity disorder."  *Id.*  She describes how there "would be often times where [she] felt disconnected from [her] own thoughts, feelings, memories and sense of identity."  *Id.*  Over time, Jakari says that she "observed how hard it is for [her] mother to create and maintain healthy bonds with friends, family, and sometimes even with [her]," and that she recalls "times where [her mother] would discipline [her] without any clear explanation."  *Id.*  She says that she has identified a similar inability to "properly communicate her true feelings and thoughts" in herself."  *Id.*  In light of these facts, Plaintiff Jakari Green is entitled to an upward adjustment to $2.75 million in solatium damages.

9.  <u>Chief Petty Officer Tiffany Putman</u>:  Stationed aboard the Cole, Plaintiff Tiffany Putman was walking past the ship post office at the time of the bombing.  *See* Compl. ¶ 3.24.  She was knocked unconscious by the explosion, and awoke to find her fellow sailors dragging her down the hall.  *See id.*  She suffered a head injury from the explosion that created a lump on her right forehead and caused post-explosion shrapnel scars, a ruptured ear drum resulting in Tinnitus in her right ear, post-traumatic migraine headaches, and PTSD resulting in insomnia, increased irritability, anger management issues, increased alcohol consumption, and an overactive startle response.  *See* Tiffany Putman Aff., Ex. K to Pls.' Mot. at 4, ECF No. 19-11.  The VA rates her PTSD as 70% disabling, her Tinnitus as 10% disabling, her facial scars as 30% disabling, and her migraines as 30% disabling.  *Id.*  In light of these facts, Plaintiff Tiffany Putnam is entitled to an upward adjustment to $6.5 million in pain and suffering damages.

i. Stephanie Putman:  The adult daughter of Plaintiff Tiffany Putman, Plaintiff Stephanie Putman, who was seven years old at the time of the Cole bombing, states that she recalls hearing about the attack as the first time she "ever felt extreme stress."  Stephanie Putman Aff., Ex. K to Pls.' Mot. at 5.  She says that when her "mom returned to the United States, she was on edge and very mean."  *Id.*  She was "short tempered and constantly angry," and "started drinking alcohol a lot more."  *Id.*  Stephanie says her mother would get "extremely upset" when people would ask about the "large knot on her forehead."  *Id.*  Stephanie was, until recently, "always on edge around her [mother] because she changed her mood so quick."  *Id.*  Overall, Stephanie states that the Cole attack "has impacted [her] relationship with [her] mom in a negative way because, after she got back, she was so mean and always having falling outs with all of her friends and even [her] dad."  *Id.*  Stephanie says her mother "spent a majority of [Stephanie's] childhood trying to recover" and "was always on different medications and having a hard time" *Id.* at 6.  Even today, Stephanie feels that she and her mother "are still trying to work on [their] relationship because of the way she was when" they lived together.  *Id.*  She summarizes that, "[h]aving a mom who was so nice and cool before the attack to having someone who is bi-polar, depressed and has PTSD is really hard to deal with."  *Id.*  In light of these facts, Plaintiff Stephanie Putnam is entitled to the base award of $2.5 million in solatium damages.

10. Petty Officer Third Class Jermaine Adyelott:[16]  Stationed aboard the Cole, Plaintiff Jermaine Adyelott was in the ship's engineering bathroom at the time of the bombing.  *See* Compl. ¶ 3.26.  The explosion knocked him to the ground, after which he assisted in search and rescue by carrying the bodies of deceased sailors off the ship.  *See id.*  He suffers from PTSD resulting in insomnia, intrusive thoughts, nightmares, panic attacks, depression, increased irritability, hyper arousal, concentration issues, and increased social avoidance.  Jermaine Adyelott Aff., Ex. N to Pls.' Mot. at 4; *see also* Ex. N. to Pls.' Mot. at 31–32, ECF No. 19-14.  In light of these facts, Plaintiff Jermaine Adyelott's base award is downward adjusted to $4.25 million in pain and suffering damages.

11. Navy Serviceman Marlon Carter:[17]  Stationed aboard the Cole, Plaintiff Marlon Carter was working the ship's mess deck at the time of the bombing.  *See* Compl. ¶ 3.29.  After the explosion, he took shelter in the ship's gallery, where he encountered the decapitated head of one of his fellow sailors in a sink.  *See id.*  He suffers from PTSD resulting in suicidal ideations, increased irritability, anger management issues, insomnia, nightmares, exaggerated startle response, increased hypervigilance, panic

---

[16] The Complaint also lists K.A., the minor son of Jermaine Adyelotte's, as a Plaintiff, but K.A. does not appear in Plaintiffs' default judgment filings, including the spreadsheet identifying damages suffered by each Plaintiff.  *See* Ex. N to Pls.' Mot; Ex. A to Pls.' Mot., Summary Spreadsheet at 9, ECF 19-1.

[17] Plaintiff Marlon Carter's rank was not specified in the Complaint.

attacks, increased alcohol consumption, anxiety, concentration issues, and increased social avoidance. *See* Marlon Carter Aff., Ex. Z to Pls.' Mot. at 4, ECF No. 19-26. The VA rates his PTSD as 70% disabling. *See id.* In light of these facts, Plaintiff Marlon Carter's base award is downward adjusted to $4.75 million in pain and suffering damages.

    i.   <u>Toni Carter</u>:  The wife of Plaintiff Marlon Carter, Plaintiff Toni Carter states that the day of the Cole bombing was the "worst day of [her] life."  Toni Carter Aff., Ex. Z to Pls.' Mot. at 5.  She says that, when her husband returned home, "understanding what we had been though, [she] knew things would be different but WOW were they different."  *Id.*  She continues, "[h]is hugs and kisses didn't feel the same," "[h]is touch wasn't the same," "[h]is listening wasn't the same," "[h]e felt so distant and so far away," "[h]is outgoing personality had been and still is cut short," "[h]is charming personality that swept [her] off [her] feet has been put away," and "[i]t makes [her] feel unwanted, unappreciated and devalued."  *Id.*  She states that their "relationship has changed because Marlon has not been the same since the blast."  *Id.*  She says it has been "so difficult for [her] to stand by someone who now wants to stand alone," and that the "cold sweats, nightmares, and temper tantrums have all been a part of who he is since his return."  *Id.*  She says "the intimacy has fizzled and died off when he got back."  *Id.* at 6.  She "had to become the mother and father due to Marlon's indecisiveness and his unwillingness to deal with issues."  *Id.*  She concludes that the attack has "impacted [her] love life, [her] mental health and really tested the strands of this marriage," which she says is "hanging on by a thread."  *Id.*  In light of these facts, Plaintiff Toni Carter's base award is downward adjusted to $3.5 million in solatium damages.

    ii.   <u>Tiffany Carter</u>:  The adult daughter of Plaintiff Marlon Carter, Plaintiff Tiffany Carter, who was ten years old at the time of the Cole bombing, states that, when her dad returned home, "he was quiet, barely could manage a smile."  Tiffany Carter Aff., Ex. Z to Pls.' Mot. at 7.  She says "it felt weird . . . as if something was out of place."  *Id.*  She states that, "[a]fter the attack, [their] relationship ha[d] changed greatly."  *Id.*  While she was a "Daddy's girl" before the attack, now "it appears as if [she] is staring into a hollow shell."  *Id.*  She says that the "bombing took something out of him" and that she wishes she "had [her] Dad back before the bombing."  *Id.* at 8.  In light of these facts, Plaintiff Tiffany Carter is entitled to the base award of $2.5 million in solatium damages.

    iii.   <u>Tyrena Carter</u>:  The adult daughter of Plaintiff Marlon Carter, Plaintiff Tyrena Carter, who was five years old at the time of the attack, states that she "remember[s] that it was somber and sad in [her] house for a long time after the attack."  Tyrena Carter Aff., Ex. Z to Pls.' Mot. at 9.  She states that, before the bombing, her father called her "his 'Lion King,'" but that "all that changed" afterward and she has "not heard him call [her] Lion King for a long

time." *Id.* Now, he just "speaks with [her] when he has too [*sic*]." *Id.* She says their "relationship is distant and this makes [her] UNHAPPY and SAD." *Id.* Before the bombing, her father "was always smiling, watching movies, and spending time with us," but afterward "he just goes into his 'Man Cave' and resides there." *Id.* In light of these facts, Plaintiff Tyrena Carter is entitled to the base award of $2.5 million in solatium damages.

    iv.  <u>Eugene Carter</u>:  The adult son of Plaintiff Marlon Carter, Plaintiff Eugene Carter, who was twelve years old at the time of the Cole bombing, states that when his father returned, he looked "beat up and sad." Eugene Carter Aff., Ex. Z to Pls.' Mot. at 11. That made Eugene feel sad and confused, as he "felt like [he] went through the attack with him." *Id.* He states that he "always wanted to be like [his] father, but the attack changed him and our relationship because the man that [he] wanted to be seemed like he lost a step in life." *Id.* He says that his father "became an introvert and shut down," so Eugene, who joined the Navy, himself "started to shut down" and left the Navy. *Id.* at 11–12. He says that his relationship with his father "hasn't been the same because he always seem[s] sad and despondent" and they "can't communicate at all." *Id.* at 12. This "impacted [Eugene] greatly because [he] wanted to lean and learn from [his father] and [he] didn't," and it makes him "sad, angry, and confused even to this day." *Id.* In light of these facts, Plaintiff Eugene Carter is entitled to the base award of $2.5 million in solatium damages.

12.  <u>Petty Officer First Class Deon Mack</u>:  Stationed aboard the Cole, Plaintiff Deon Mack was in line in the ship's mess hall at the time of the bombing. *See* Compl. ¶ 3.34. He was knocked to the ground by the explosion, and during the ensuing chaos saw "numerous disfigured body parts belonging to his fellow sailors and a horrifying amount of blood and guts." *Id.* He suffers from adjustment disorder resulting in depression, increased startle response, increased hypervigilance, intrusive thoughts about the bombing, and chronic sleep impairment. *See* Deon Mack Aff., Ex. S to Pls.' Mot. at 4, ECF No. 19-19. The VA rates his adjustment disorder as 30% disabling. *See id.* In light of these facts, Plaintiff Deon Mack's base award is downward adjusted to $4.5 million in pain and suffering damages.

    i.  <u>Ashilia Mack</u>:  The adult daughter of Plaintiff Deon Mack, Plaintiff Ashilia Mack, who was five years old at the time of the bombing, says that her father "was not the same person" when he came home. Ashilia Mack Aff., Ex. S to Pls.' Mot. at 5. In contrast to the "fun-loving parent" she knew before the bombing, afterward her father "became withdrawn and was no longer the fun parent he used to be." *Id*. He "did not want to take me on fun weekend activities anymore, which was very frustrating and disheartening for [her] as a child." *Id*. While her father's condition improved as she grew older, "the change in his personality was permanent" and "fundamentally altered [their] relationship." *Id.* She believes that "if the USS Cole attack never occurred, [she] would have a much stronger bond with [her] father." *Id.* In light of

these facts, Plaintiff Ashilia Mack is entitled to the base award of $2.5 million in solatium damages.

13. <u>Seaman Apprentice Keelta Mills</u>:  Stationed aboard the Cole, Plaintiff Keelta Mills had just been relieved from watch duty at the time of the bombing.  *See* Compl. ¶ 3.36.  She was then ordered to assist injured sailors at her battle station, where she encountered dead and injured fellow sailors, including "the mangled bodies of two of her best friends folded inside a collapsed bulkhead."  *Id.*  She suffers from sleep apnea and PTSD resulting in alcohol abuse, sleep disturbance, intrusive thoughts, nightmares and flashbacks of the bombing, avoidance of triggering sights and smells, visualizations of sailors who died in the bombing, hypervigilance, and interpersonal dysfunction.  *See* Keelta Mills Aff., Ex. T to Pls.' Mot. at 4, ECF No. 19-20.  The VA rates her PTSD as 70% disabling, with an overall disability rating of 100%.  *See Id.*  In light of these facts, Plaintiff Keelta Mills's base award is downward adjusted to $4.75 million in pain and suffering damages.

    i.  <u>Mary Ward</u>:  The mother of Plaintiff Keelta Mills, Plaintiff Mary Ward states that when her daughter returned, she "seemed quiet and just slept a lot, did not go anywhere, did not eat much, and drank a lot."  Mary Ward Aff., Ex. T to Pls.' Mot. at 5.  She states that Keelta was "definitely different," that she was "in a fog" and her "mood was up and down."  *Id.*  She says that her daughter "would not want the blinds open and cried out in her sleep" and also sleep walked.  *Id.*  She says their relationship is "distant," as her daughter "does not talk much," "stays in her room a lot," and "always feels someone is following us."  *Id.*  Her daughter "experiences mood swings, suicidal thoughts, [and] survival guilt," and they "still feel the impact today."  *Id.*  In light of these facts, Plaintiff Mary Ward is entitled to the base award of $2.5 million in solatium damages.

14. <u>Petty Officer Second Class Bryan Mitchell, Sr.</u>:  Stationed aboard the Cole, Plaintiff Bryan Mitchell had just finished emailing his wife at the time of the bombing, at which point he was ordered to his battle station.  *See* Compl. ¶ 3.39.  There, he helped gather the bodies of fallen sailors and helped transport injured sailors to receive medical attention.  *See id.*  He suffers from a right knee injury resulting in chronic pain, a cleavage tear in his left knee resulting in chronic pain, a high-grade partial tear in his left knee requiring surgery, and PTSD resulting in alcohol abuse disorder, increased irritability, concentration issues, feelings of social isolation, and intrusive memories.  *See* Bryan Mitchell, Sr. Aff., Ex. F to Pls.' Mot. at 4, ECF No. 19-6.  The VA rates his PTSD as 100% disabling, and his left knee as 20% disabling.  *See id.*  In light of these facts, Plaintiff Bryan Mitchell, Sr. is entitled to the base award of $5 million in pain and suffering damages.

15. <u>Petty Officer First Class Aaron Morgan</u>:  Stationed aboard the Cole, Plaintiff Aaron Morgan was attending a moral welfare and recreation meeting in the ship classroom, located about 100 feet from the blast, at the time of the attack.  *See* Compl. ¶ 3.40.  He suffers from post-explosion trauma resulting in alcohol abuse issues, alcohol

dependence, nightmares, social avoidance, increased startle response, and increased hypervigilance. Aaron Morgan Aff., Ex. U to Pls.' Mot. at 3, ECF No. 19-21. In light of these facts, Plaintiff Aaron Morgan's base award is downward adjusted to $4.25 million in pain and suffering damages.

16. Petty Officer First Class Adrian Payne:[18] Stationed aboard the Cole, Plaintiff Adrian Payne was on the middle deck of the ship at the time of the bombing. *See* Compl ¶ 3.41. Following orders to search the ship to identify deceased sailors and provide medical assistance to injured sailors, he saw "numerous mangled bodies, including the decapitated head of one of his fellow sailors lying in a sink." *Id.* He also had to decide "who to help and who to leave for dead." *Id.* He suffers from PTSD resulting in alcohol abuse issues, depression insomnia, nightmares, high blood pressure, erectile dysfunction, decreased cognitive functioning due to fatigue, panic attacks that prevent him from safely operating his car, increased hypervigilance, exaggerated startle response, and inability to attend events like concerts, movies, and his son's sporting and school events due to an aversion to crowds and loud noises. Adrian Payne Aff., Ex. Y to Pls.' Mot. at 6, ECF No. 19-25. The VA rates his PTSD as 100% disabling. *Id.* He has not been able to maintain a job due to his PTSD, and relies on his wife to "take care of everything." *Id.* He says it has "been very difficult for both [his] family and [him] to live a normal life." *Id.* at 7. In light of these facts, Plaintiff Adrian Payne's base award is downward adjusted to $4.75 million in pain and suffering damages.

   i. Kenneth Payne: The brother of Plaintiff Adrian Payne, Plaintiff Kenneth Payne states that it took about three weeks to find out whether his brother was dead or alive after the Cole bombing, during which time he had a "horrifying feeling" and "was very depressed and had to be medicated to cope." Kenneth Payne Aff., Ex. Y to Pls.' Mot. at 10. He states that when his brother returned home, "he was in no condition to handle any responsibility," so he "had to help with his activities of daily living, work around the house, cutting grass, and driving him to doctors' visits." *Id.* He also helped with his brother's "parental duties." *Id.* Seeing his brother like this was "very painful and heartbreaking" for Kenneth, and his own "depression spiraled out of control and started [him] on a journey of drug and alcohol addiction." *Id.* He used drugs and alcohol "as a way of relieving the pressures that had built up from seeing [his] brother suffering." *Id.* He remains "very much active in helping [his] brother with his personal and daily activities," including "housework and things with his son." *Id.* at 10–11. He says that "[e]very day is a struggle." *Id.* at 11. In light of these facts, Plaintiff Kenneth Payne is entitled to an upward adjustment to $1.5 million in solatium damages.

---

[18] The Complaint also lists J.P., the minor son of Adrian Payne, as a Plaintiff, but J.P. does not appear in Plaintiffs' default judgment filings, including their spreadsheet identifying damages suffered by each Plaintiff. *See* Ex. Y to Pls.' Mot; Summary Spreadsheet at 12–13.

ii. <u>Nyshantae Payne</u>:  The adult daughter of Plaintiff Adrian Payne, Plaintiff Nyshantae Payne, who was four years old at the time of the Cole bombing, states that when she got a few years older, she was "able to understand [she] was greatly affected" by the attack.  Nyshantae Payne Aff., Ex. Y to Pls.' Mot. at 12.  Her father "couldn't take [her] places like a normal father would because of his PTSD, panic attacks, and being very nervous around people," and this made Nyshantae "angry and resentful" toward him.  *Id.*  She "did not get the experience of [her] dad spending time and doing this with [her], including school functions, all the way up to [her] adulthood."  *Id.*  She "would become angry and depressed when [she] would see other children with their fathers as [she] did not have [hers] with [her]," and she became "increasingly overwhelm[ed] as [she] got to [her] teenage years."  *Id.*  The absence of her father as an "active" presence in her life "has caused [her] to struggle with trust issues, feelings of resentment toward others, depression, and [she has] very few friends."  *Id.*  Nyshantae has a son of her own, and her father "is not able to attend his grandson's school activities, sporting events, and spend time with him outside the home."  *Id.* at 13.  Her relationship with her father "has suffered greatly and is and up and down battle because of the trauma he has experienced."  *Id.*  In light of these facts, Plaintiff Nyshantae Payne is entitled to the base award of $2.5 million in solatium damages.

iii. <u>Sherita Payne</u>:  The sister of Plaintiff Adrian Payne, Plaintiff Sherita Payne states that when the family "received the news that [Adrian] was ok, [they] didn't know that he would have lasting effects such as PTSD and panic attacks."  Sherita Payne Aff., Ex. Y to Pls.' Mot. at 14.  She says that the Cole bombing "has really affected [her brother] socially and emotionally,"  and has caused him to "miss many important events in [her] life," such as her college graduation, her wedding, and events surrounding the birth of her first child.  *Id.*  Her brother also "is unable to attend any family gatherings such as Thanksgiving, Christmas, and birthdays," and has a "hard time assisting in the care of [their] elderly mother.  *Id.*  She feels sad that her brother's suffering has caused him to miss important events and "not have a relationship with his nephews and [their] mother."  *Id.* at 14–15.  In light of these facts, Plaintiff Sherita Payne is entitled to the base award of $1.25 million in solatium damages.

17. <u>Senior Chief Petty Officer Shevar Reynolds</u>:  Stationed aboard the Cole, Plaintiff Shevar Reynolds was located one deck down from the main deck, below the water line, at the time of the bombing.  *See* Compl. ¶ 3.47.  He joined the "fire squad that led a search and rescue mission throughout the ship," during which he rescued sailors suffering from severe injuries and encountered the "mangled bodies" of deceased sailors.  *Id.*  He specifically recalls witnessing seeing a fallen sailor's "eye hanging out from its socket."  *Id.*  He suffers from PTSD resulting in insomnia, nightmares, intrusive memories, panic attacks in crowded places, difficulties with interpersonal relationships, insecurity and uneasiness in social settings, and generalized dysthymia.  Shevar Reynolds Aff., Ex. V to Pls.' Mot. at 3, ECF No. 19-22.  The VA rates his

PTSD as 100% disabling.  *See id.*  In light of these facts, Plaintiff Shevar Reynolds's base award is downward adjusted to $4.75 million in pain and suffering damages.

18. <u>Chief Petty Officer Angel Simmons</u>:  Stationed aboard the Cole, Plaintiff Angel Simmons was in her room at the time of the bombing.  *See* Compl. ¶ 3.48.  The explosion lifted her in the air and caused her to hit the floor with force.  *See id.*  She also saw a fellow sailor slide across the ship due to the sudden disruption in the ship's equilibrium.  *See id.*  She suffers from PTSD and Major Depressive Disorder, resulting in survivor's guilt, insomnia, nightmares, chronic sleep impairment, suicidal ideation, occupational and social impairment, loss of appetite, anxiety, intrusive memories "of the sights and smells of burnt sailors after the bombing," increased irritability, concentration issues, increased hypervigilance, exaggerated startle response, and crowd avoidance.  Angel Simmons Aff., Ex. X to Pls.' Mot. at 4, ECF No. 19-24.

She states that after the attack, her "entire life changed" and she was "no longer that fun, loving, outgoing person" and instead was "completely detached from [her] family and reality."  *Id.*  After the attack, she "was emotionally detached and [her] communication in [her] marriage gradually ceased" as whenever she would try to discuss the attack she "would always cry uncontrollably."  *Id.*  Consequently, she "withdrew from [her] husband."  *Id.*  She "stayed in bed for days without taking a bath or shower, [she] did not cook, [she] did not clean, [she] stopped being sociable, [she] stopped communicating and [she] stopped making love to [her] husband and [she] started drinking heavily."  *Id.*  She "pushed [her] husband, [her] best friend away and the love [her] husband and [she] had for each other had no longer existed," resulting in their divorce.  *Id.* at 5.  She states that "PTSD put [her] in an impenetrable shell that [she is] unable to crawl out of."  *Id.*  The VA rates her PTSD as 70% disabling and her over disability at 100%.  *Id.*  She says she is "still reliving and carrying terrorist attack memories from [her] ship within [her]."  *Id.*  In light of these facts, Plaintiff Angel Simmons's base award is downward adjusted to $4.75 million in pain and suffering damages.

i. <u>Paul Graham</u>:  The father of Plaintiff Angel Simmons, Plaintiff Paul Graham states that it was "very intense" waiting to hear about the condition of his daughter after the bombing.  Paul Graham Aff., Ex. X to Pls.' Mot. at 7.  He "did not eat, or drink, and it was an extremely stressful time."  *Id.*  When she returned home, "Angel was not the same person we knew, she was a changed person."  *Id.*  She was "extremely reserved, and you could tell that there was something heavy weighing inside of her from what she experienced on the ship."  *Id.*  He says, as her father, it "feels like [he] went through what she went through," and he "can feel her pain."  *Id.* at 8.  It is "putting a strain on [his] heart" that "she is not the same happy person [he] once knew."  *Id.*  In light of these facts, Plaintiff Paul Graham is entitled to the base award of $2.5 million in solatium damages.

ii. <u>Leonia Graham</u>:  The mother of Plaintiff Angel Simmons, Plaintiff Leonia Graham states that the feeling of not knowing what happened to her daughter in the immediate aftermath of the Cole bombing "tore [her] apart."  Leonia Graham Aff., Ex. X to Pls.' Mot. at 9.  She could not eat or drink, was crying, and "could not breathe."  *Id.*  But "something was different about her" when she got home.  *Id.* at 10.  Her daughter "kept to herself more," "was snappy," and "started drinking a lot," which "put a strain" on their relationship.  *Id.*  All these years later, she is still "very stressed about [her] daughter," who she says is a "different person now."  *Id.*  After watching her daughter live through a terrorist bombing attack, she is "unhappy," "angry," and experiences pain and stress that "has seriously affected [her] and [her] well-being."  *Id.*  She feels like she "went through it" with her daughter, and is still "living with the after effects of emotional stress."  *Id.*  In light of these facts, Plaintiff Leonia Graham is entitled to the base award of $2.5 million in solatium damages.

19. <u>Chief Petty Officer Stafford Tyson</u>:  Stationed aboard the Cole, Plaintiff Stafford Tyson was eating lunch in the mess hall at the time of the bombing.  *See* Compl. ¶ 3.51.  He ran to the top deck, where he witnessed many sailors suffering from injuries.  *See id.*  He suffers from PTSD resulting in occasional depression and intrusive memories of the bombing.  Stafford Tyson Aff., Ex. W to Pls.' Mot. at 4, ECF No. 19-23.  The VA rates his PTSD as 30% disabling.  *See id.*  In light of these facts, Plaintiff Stafford Tyson's base award is downward adjusted to $4.5 million in pain and suffering damages.

20. <u>Petty Officer Third Class Detarence Harris</u>:  Stationed aboard the Cole, Plaintiff Detarence Harris was standing at the water line about four or five feet from the blast at the time of the bombing.  *See* Compl. ¶ 3.53.  He suffered a TBI resulting in loss of consciousness and PTSD "caused by the memory of removing human remains of [his] deceased and maimed shipmates from the damaged area of the ship."  Detarence Harris Aff., Ex. M to Pls.' Mot. at 4, ECF No. 19-13.  His PTSD causes "severe and lingering" stress and mood symptoms, nightmares, insomnia, intrusive flashbacks of the bombing, increased startle response, hypervigilance, social avoidance, alcohol use disorder, increased irritability, and anger management issues.  *Id.*  The VA rates his PTSD as 30% disabling.  *See id.*  In light of these facts, Plaintiff Detarence Harris's base award is downward adjusted to $4.75 million in pain and suffering damages.

21. <u>Petty Officer Second Class Tayinikia Carlton</u>:  Stationed aboard the Cole, Plaintiff Tayinikia Carlton was in the medical facility on the starboard side of the ship at the time of the bombing.  *See* Compl. ¶ 3.55.  The explosion threw her backwards and dislodged the doors so that smoke filled the room.  *See id.*  She observed severe injuries of fellow sailors.  *See id.*  She suffers from PTSD resulting in intrusive flashbacks, nightmares of the explosion, insomnia, anxiety, decreased interest in social activities and exercise, concentration issues, an exaggerated startle response, increased hypervigilance, depression, anorexic episodes, and survivor's guilt.  *See* Tayinikia Carlton Aff., Ex. R to Pls.' Mot. at 3, ECF No. 19-18. The VA rates her

PTSD as 70% disabling.  *See id.*  In light of these facts, Plaintiff Tayinikia Carlton's base award is downward adjusted to $4.75 million in pain and suffering damages.

22. <u>Petty Officer Second Class Miss Belcher</u>:[19]  Stationed aboard the Cole, Plaintiff Miss Belcher was attending a meeting at the time of the bombing.  *See* Compl. ¶ 3.56.  She moved to the "Defcon Station" after the explosion, where she witnessed sailors bleeding from their ears and suffering from severe shrapnel injuries.  *See id.*  She performed CPR on one of the sailors, and saw another sailor whose body was "blown apart" by the explosion.  *Id.*  She suffers from Major Depressive Disorder resulting in loss of interest in daily life and hopelessness and PTSD resulting in increased irritability, anger management issues, increased alcohol consumption, increased tobacco consumption, insomnia, concentration issues, and increased social avoidance.  Miss Belcher Aff., Ex. P to Pls.' Mot. at 4, ECF No. 19-16.  The VA rates her PTSD and Major Depressive Disorder as 70% disabling.  *See id.*  In light of these facts, Plaintiff Miss Belcher's base award is downward adjusted to $4.75 million in pain and suffering damages.

     i.  <u>Kristion Belcher</u>:  The adult son off Plaintiff Miss Belcher, Plaintiff Kristion Belcher, who was two years old at the time of the Cole bombing, says that his mother was not "emotionally available for [him] because of her own trauma and it felt like walking around eggshells."  Kristion Belcher Aff., Ex. P to Pls.' Mot. at 6.  For example, his mother found a note in his room identifying him as bisexual, and she "became extremely angry that [he] did not tell her, and she felt it was her problem."  *Id.*  He says that all of her mother's emotional issues "would wrap about how she grew up and what she went through on the USS Cole," and that the family "still feel[s] the scars of the USS Cole attack today."  *Id.*  In light of these facts, Plaintiff Kristion Belcher is entitled to the base award of $2.5 million in solatium damages.

23. <u>Petty Officer Second Class Charrod Taylor</u>:[20]  Stationed aboard the Cole, Plaintiff Charrod Taylor was on duty near the blast on the day of the Cole bombing.  *See* Compl. ¶ 3.59.  He saw smoke and bodies lying on the deck and floating in the water.  *See id.*  He also helped to identify and move dead bodies.  *Id.*  He suffers from PTSD resulting in insomnia, nightmares, short-term memory issues, increased hypervigilance that impairs his ability to function at work and in social settings, difficulty trusting others, and concentration issues.  Charrod Taylor Aff., Ex. AA to Pls.' Mot. at 4, ECF No. 19-27.  The VA rates his PTSD as 70% disabling.  *See id.*  In

---

[19] The Complaint also lists N.J., the minor son of Miss Belcher, as a Plaintiff, but N.J. does not appear in Plaintiffs' default judgment filings, including their spreadsheet identifying damages suffered by each Plaintiff.  *See* Ex. P to Pls.' Mot; Summary Spreadsheet at 10.

[20] The Complaint also lists K.T., the minor daughter of Charrod Taylor, and L.T. and M.T., the minor sons of Charrod Taylor, as Plaintiffs, but they do not appear in Plaintiffs' default judgment filings, including their spreadsheet identifying damages suffered by each Plaintiff.  *See* Ex. AA to Pls.' Mot; Summary Spreadsheet at 14.

light of these facts, Plaintiff Charrod Taylor's base award is downward adjusted to $4.75 million in pain and suffering damages.

    i.  <u>Tashomba Taylor</u>: The older brother of Plaintiff Charrod Taylor, Plaintiff Tashomba Taylor states that the days after the Cole bombing when he did not yet know of his brother's condition were "some of the worst days of [his] life." Tashomba Taylor Aff., Ex. AA to Pls.' Mot. at 5. He says his brother was a "shell of himself" upon his return, that his "body was present, but [he] could tell his mental state was altered." *Id.* at 6. Tashomba states that he and his brother were "extremely close" before the attack, but that "connection has been taken away due to his PTSD," as now he will "lash out at [him] just for asking how he [is] feeling, or if he need[s] anything." *Id.* He has witnessed his brother get into "enraged outbreaks publicly," and has had to get "into altercations" himself in order to "resolve issues between [his brother] and others." *Id.* Tashomba says it "just kills [him] to see [his] little brother hurting and not being able to do anything about it," and as a result he has suffered "elevated stress levels and mental break downs where [he] also had to seek counseling." *Id.* In light of these facts, Plaintiff Tashomba Taylor is entitled to an upward adjustment to $1.5 million in solatium damages.

    ii.  <u>Osa Neal</u>: The sister of Plaintiff Charrod Taylor, Plaintiff Osa Neal states that it was "devastating" to learn of the Cole bombing and she "cried everyday until [the family] heard from him" in its aftermath. Osa Neal Aff., Ex. AA to Pls.' Mot. at 7. Ten years old at the time of the bombing, as she grew older she "noticed a change in [her] brother," as he "didn't sleep . . . had nightmares, and he detailed having to help remove graphic things pertaining to his deceased friends and shipmates that will forever be engraved in his memory." *Id.* She "still worr[ies] for [her] brother constantly because [she knows] that he would never mentally be the same again." *Id.* at 7–8. In light of these facts, Plaintiff Osa Neal is entitled to the base award of $1.25 million in solatium damages.

    iii.  <u>Rose Neal</u>: The mother of Plaintiff Charrod Taylor, Plaintiff Rose Neal says she was "crying uncontrollably and angry" while she awaited word of her son after the Cole bombing. Rose Neal Aff., Ex. AA to Pls.' Mot. at 9. She states that, since her son returned, he "is distant and won't talk to [her] like he used too [*sic*]." *Id.* It hurts her to see her son unhappy and she says that her relationship with him will never be the same because of the bombing. *See id.* In light of these facts, Plaintiff Rose Neal is entitled to the base award of $2.5 million in solatium damages.

24. <u>Jaja O'Neil</u>:[21]  Stationed aboard the Cole, Plaintiff Jaja O'Neil was in the Combat Information Center at the time of the bombing. *See* Compl. ¶ 3.66. He was thrown

---

[21] Plaintiff Jaja O'Neil's rank was not specified in the Complaint. The Complaint also lists E.O., J.K.O., and J.M.O., the minor sons of Jaja O'Neil, as Plaintiffs, but they do not appear

against the overhead compartment by the explosion, hitting his head, shoulders, and back before landing hard on the floor. *See id.* He thereafter helped to extract injured and deceased sailors, during which he saw their mangled bodies. *See id.* He suffered rotator cuff strains in both shoulders from transporting injured crewmembers in a "fireman's carry" after being slammed into the overhead compartment, left and right knee osteoarthritis, Obstructive Sleep Apnea, and PTSD resulting in insomnia, chronic fatigue, depression, anxiety, memory loss, and debilitating migraines. Jaja O'Neil Aff., Ex. I to Pls.' Mot. at 4, ECF No. 19-9. The VA rates his shoulder injuries as 20% disabling, his knee injuries as 20% disabling, his PTSD as 10% disabling and his sleep apnea as 50% disabling.[22] *See id.* In light of these facts, Plaintiff Jaja O'Neil's base award is downward adjusted to $4.75 million in pain and suffering damages.

      i.    <u>Jasmine Baker</u>: The adult daughter of Plaintiff Jaja O'Neil, Plaintiff Jasmine Baker, who was eight years old at the time of the Cole bombing, states that, after the attack, her "father became mean spirited and was very impatient with everyone, including [her]." Jasmine Baker Aff., Ex. I to Pls.' Mot. at 5. He "no longer enjoyed going to places with large or tight crowds" and "appeared distant as if his mind was somewhere else and his disposition became rude." *Id.* This has "not changed over the years" and they have a "mostly distant relationship." *Id.* She "wish[es] his ship was not attacked so [she] could have kept [her] fun-loving dad[.]" *Id.* In light of these facts, Plaintiff Jasmine Baker is entitled to the base award of $2.5 million in solatium damages.

25.   <u>Petty Officer First Class Denize Alton-Johnson</u>:[23] Stationed aboard the Cole, Plaintiff Denize Alton-Johnson was sitting in the ship's annex near heavy safes at the time of the bombing. *See* Compl. ¶ 3.72. The blast dislodged the doors of the safes and debris hit her and injured her arm. *See id.* She had to step over multiple bodies as she left the annex. *See id.* She suffers from Adjustment Disorder with Mixed Anxiety and Depression resulting in increased alcohol consumption, chronic sleep impairment, nightmares, and intrusive memories of the bombing. *See* Denize Alton-Johnson Aff., Ex. O to Pls.' Mot. at 5, ECF No. 19-15. The VA rates her Adjustment

---

in Plaintiffs' default judgment filings, including their spreadsheet identifying damages suffered by each Plaintiff. *See* Ex. I to Pls.' Mot; Summary Spreadsheet at 6.

[22] The medical records submitted by Plaintiff Jaja O'Neil do not indicate a clear connection between his sleep apnea and the Cole bombing. *See, e.g.*, Jaja O'Neil Aff. at 49 (describing "sleep disturbance" only in reference to "PTSD, stress management, and insomnia" stemming from "a bombing incident during military service" but making no mention of sleep apnea, which is discussed in other records without reference to the bombing). As such, the Court does not base its award calculation on the VA's disability rating for sleep apnea.

[23] The Complaint also lists D.J., the minor son of Denize Alton-Johnson, as a Plaintiff, but he does not appear in Plaintiffs' default judgment filings, including their spreadsheet identifying damages suffered by each Plaintiff. *See* Ex. O to Pls.' Mot; Summary Spreadsheet at 9–10.

Disorder as 50% disabling.  *See id.*  In light of these facts, Plaintiff Denize Alton-Johnson's base award is downward adjusted to $4.75 million in pain and suffering damages.

    i.   <u>Yvette Franklin</u>:  The mother of Plaintiff Denize Alton-Johnson, Plaintiff Yvette Franklin states that "after the attack, Denize has become quiet" and is "not the outgoing person she used to be."  Yvette Franklin Aff., Ex. O to Pls.' Mot. at 7.  She says her daughter "does not seem to be able to find joy" and "is not as compassionate as she used to be."  *Id.*  She says "there is a coldness, no more mommy-daughter secrets, no special time together, just a call if I need something relationship."  *Id.*  She "miss[es] [her] daughter."  *Id.*  In light of these facts, Plaintiff Yvette Franklin is entitled to the base award of $2.5 million in solatium damages.

    ii.  <u>Erik Alton</u>:  The brother of Plaintiff Denize Alton-Johnson, Plaintiff Erik Alton states that the day of the Cole bombing "will always be a lost and emotionally draining day" and that he "never felt so bad in [his] life" as he did waiting to hear of his sister's condition.  Erik Alton Aff., Ex. O to Pls.' Mot. at 8.  He says the "effects of this terrible event have cut her so deep" and that her "drinking and inability to sleep without nightmares was unbearable."  *Id.* at 9.  He says that their shared dream of taking a Disney cruise was "taken away from" them on the day of the Cole bombing.  *Id.*  The attack is "still something all of [his] family deals with every day."  *Id.*  In light of these facts, Plaintiff Erik Alton is entitled to the base award of $1.25 million in solatium damages.

### 3.  Prejudgment Interest

Whether to award prejudgment interest is "subject to the discretion of the court and equitable considerations."  *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quotation and citation omitted).  Because "[p]rejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987) (citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 & n.10 (1983)), it should be denied "[w]hen an award without prejudgment interest fully compensates a plaintiff."  *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005)).

As the Court explained in detail in *Barry v. Islamic Republic of Iran (Barry II)*, 437 F. Supp. 3d 15 (D.D.C. 2020), "[c]ourts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits," and "[w]here courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which the claimants received relief." *Id.* at 60–62 (listing examples).  However, drawing on guidance from the Restatement of Torts, the Court found that "fundamental principles of tort law . . . cut against the award of interest" for pain and suffering or solatium damages, especially because the calculation of those damages should already account for any additional suffering during the delay between the original injury and the damages award.  *Id.* at 61–62; *see also Ben-Yishai v. Syrian Arab Republic*, No. 18-cv-3150, 2022 WL 17250344, at *16 (D.D.C. Nov. 28, 2022) (declining the award prejudgment interest on solatium damages because "the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing").  The Court adopts the *Barry II* analysis here and declines to award prejudgment interest.

### 4.   Punitive Damages

The Supreme Court "decided that [retroactive] punitive damages *are* permissible for federal claims" brought under 28 U.S.C. § 1605A.  *Opati v. Republic of Sudan*, 140 S Ct. 1601, 1610 (2020).  Thus, because all Plaintiffs here properly bring their claims under the federal private right of action established by section 1605A(c), *see supra* Section IV.C at n.10, they are eligible to seek punitive damages.  "Courts calculate the proper amount of punitive damages by considering four factors: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'"  *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 81

(D.D.C. 2014) (citation omitted); *Flatow*, 999 F. Supp. at 32 (identifying these four factors as

governing punitive damages under "[g]eneral principles of tort law" (citing RESTATEMENT

(SECOND) OF TORTS § 908)), abrogated on other grounds *Haim v. Islamic Republic of Iran*, 425 F.

Supp. 2d 56, 71 n.2 (D.D.C. 2006).

> As another court in this District recently explained,

> [t]his District has developed three primary methods of calculating punitive damages in
> FSIA cases.  The first, used more commonly in mass-casualty events, involves
> multiplying the foreign state's "annual expenditures on terrorism" by a factor between
> three and five.  The second approach awards a fixed amount of $150 million per affected
> family.  The third approach involves multiplying the total compensatory damages award
> by a factor of between one and five.  The multiplier approach is especially appropriate
> when the defendants "did not directly carry out the attack, but funded [a proxy actor],
> [and] it is doubtful whether a large amount . . . would have the deterrent effect that it
> might have had in times past."

*Ben-Yishai*, 2022 WL 17250344, at *15 (citations omitted).  Plaintiffs suggest, and the Court

agrees, that the third approach is most appropriate here.  *See* Proposed Damages Chart at 2 n.1.

Plaintiffs request a ratio of "3:1 punitive-to-compensatory damages," *id.*, and the Court adopts

this approach, as a "multiplier of three" is the "usual practice in state sponsored terrorism cases,"

*Roth v. Syrian Arab Republic*, No. 14-cv-1946, 2018 WL 4680270, at *17 (D.D.C. Sept. 28,

2018).[24]  Accordingly, the court awards $605.25 million in punitive damages, which is three

---

[24] Punitive damages were previously awarded against Iran for the Cole bombing in
*Flanagan*.  *See* 87 F. Supp. 3d at 126–27.  While "[r]ecurrent awards in case after case arising
out of the same facts can financially cripple a defendant, over-punishing the same conduct
through repeated awards with little additional deterrent effect," these concerns are not overriding
here.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 81 (D.D.C. 2010).  First,
*Flanagan* involved only five Plaintiffs—family members of one of the American sailors killed in
the Cole bombing—so it can hardly be assumed that the punitive damages awarded in that case,
which were also applied based on the multiplier approach, amounted to sufficient punishment or
deterrence.  Second, and relatedly, because the Court also adopts the multiplier approach here,
the punitive damage awards are "personal to plaintiffs" and therefore not "excessive" despite
arising out of the same bombing as *Flanagan*.  *Id.*

times the combined total of $201.75 million awarded in compensatory damages.  *See infra*
Annex.

5.  Post-Judgment Interest and Attorneys' Fees and Costs

The federal post-judgment interest statute provides that "[i]nterest shall be allowed on
any money judgment in a civil case recovered in a district court" and that such interest "shall be
calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year
constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve
System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  The
statute further provides that "[i]nterest shall be computed daily to the date of payment . . . and
shall be compounded annually."  § 1961(b).  Because "[a]pplication of section 1961(a) is
mandatory, not discretionary," *Schooley*, 2019 WL 2717888 at *79 (citations omitted), the Court
awards Plaintiffs post-judgment interest at the statutory rate.

Plaintiffs also request reasonable attorneys' fees and costs.  *See* Compl. ¶ 7.1.  However,
the Court "is not aware of any statutory or other basis for the award of attorney's fees," *Kinyua v.*
*Republic of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020), and Plaintiffs "have not provided any
information regarding the fees and costs sought," *Schooley*, 2019 WL 2717888 at *79, so the
request is denied.  *See also Mark v. Islamic Republic of Iran*, No. 20-cv-651, 2022 WL4103854,
at *19 (D.D.C. Sept. 8, 2022).

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Default Judgment (ECF No. 19) is
**GRANTED**.  As set forth for each Plaintiff in the attached Annex, Directly Injured Plaintiffs are
awarded $128.75 million in pain and suffering damages, Family Plaintiffs are awarded $73

million in solatium damages, and Plaintiffs are awarded $605.25 million in punitive damages.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 16, 2023                                  RUDOLPH CONTRERAS
                                                        United States District Judge

**ANNEX**

| | Plaintiff | | Compensatory Damages ($) | | Punitive Damages ($) | Total Damages ($) |
|---|---|---|---|---|---|---|
| | Name | Category[25] | Pain & Suffering | Solatium | | |
| 1 | Sean Taitt | DI | 7 million | | 21 million | 28 million |
| 2 | Craig Freeman | DI | 6 million | | 18 million | 24 million |
| 3 | Mary Ousley | F | | 2.5 million | 7.5 million | 10 million |
| 4 | Maia Freeman | F | | 2.5 million | 7.5 million | 10 million |
| 5 | Angela Brown | F | | 1.25 million | 3.75 million | 5 million |
| 6 | Abigail Prather | F | | 1.25 million | 3.75 million | 5 million |
| 7 | Veronica Reese | F | | 1.25 million | 3.75 million | 5 million |
| 8 | Michael Proctor | DI | 7 million | | 21 million | 28 million |
| 9 | Isadore Sims | DI | 6 million | | 18 million | 24 million |
| 10 | Alexander Sims | F | | 2.5 million | 7.5 million | 10 million |
| 11 | Taebryanna Sims | F | | 2.5 million | 7.5 million | 10 million |
| 12 | Sheila Cooper | DI | 5 million | | 15 million | 20 million |
| 13 | Lynell Cooper | F | | 1.25 million | 3.75 million | 5 million |
| 14 | Rodney Jackson | DI | 6.5 million | | 19.5 million | 26 million |
| 15 | Diquan Jackson | F | | 2.5 million | 7.5 million | 10 million |
| 16 | Jacquez Jackson | F | | 2.5 million | 7.5 million | 10 million |
| 17 | Tiffany Major | F | | 2.5 million | 7.5 million | 10 million |
| 18 | Marlon O'Neil | DI | 5 million | | 15 million | 20 million |
| 19 | Franklin O'Neil | F | | 2.5 million | 7.5 million | 10 million |
| 20 | Deloris O'Neil | F | | 2.5 million | 7.5 million | 10 million |
| 21 | Donna Green | DI | 5 million | | 15 million | 20 million |
| 22 | Jakari Green | F | | 2.75 million | 8.25 million | 11 million |
| 23 | Tiffany Putnam | DI | 6.5 million | | 19.5 million | 26 million |
| 24 | Stephanie Putnam | F | | 2.5 million | 7.5 million | 10 million |
| 25 | Jermaine Adyelott | DI | 4.25 million | | 12.75 million | 17 million |
| 26 | Marlon Carter | DI | 4.75 million | | 14.25 million | 19 million |
| 27 | Toni Carter | F | | 3.5 million | 10.5 million | 14 million |
| 28 | Tiffany Carter | F | | 2.5 million | 7.5 million | 10 million |
| 29 | Tyrena Carter | F | | 2.5 million | 7.5 million | 10 million |

[25] Directly Injured Plaintiffs are referred to with the notation "DI" and Family Plaintiffs are referred to with the notation "F". Family Plaintiffs are also denoted in shaded rows.

| 30 | Eugene Carter | F | | 2.5 million | 7.5 million | 10 million |
|---|---|---|---|---|---|---|
| 31 | Deon Mack | DI | 4.5 million | | 13.5 million | 18 million |
| 32 | Ashilia Mack | F | | 2.5 million | 7.5 million | 10 million |
| 33 | Keelta Mills | DI | 4.75 million | | 14.25 million | 19 million |
| 34 | Mary Ward | F | | 2.5 million | 7.5 million | 10 million |
| 35 | Bryan Mitchell, Sr. | DI | 5 million | | 15 million | 20 million |
| 36 | Aaron Morgan | DI | 4.25 million | | 12.75 million | 17 million |
| 37 | Adrian Payne | DI | 4.75 million | | 14.25 million | 19 million |
| 38 | Kenneth Payne | F | | 1.5 million | 4.5 million | 6 million |
| 39 | Nyshantae Payne | F | | 2.5 million | 7.5 million | 10 million |
| 40 | Sherita Payne | F | | 1.25 million | 3.75 million | 5 million |
| 41 | Shevar Reynolds | DI | 4.75 million | | 14.25 million | 19 million |
| 42 | Angel Simmons | DI | 4.75 million | | 14.25 million | 19 million |
| 43 | Paul Graham | F | | 2.5 million | 7.5 million | 10 million |
| 44 | Leonia Graham | F | | 2.5 million | 7.5 million | 10 million |
| 45 | Stafford Tyson | DI | 4.5 million | | 13.5 million | 18 million |
| 46 | Detarence Harris | DI | 4.75 million | | 14.25 million | 19 million |
| 47 | Tayinikia Carlton | DI | 4.75 million | | 14.25 million | 19 million |
| 48 | Miss Belcher | DI | 4.75 million | | 14.25 million | 19 million |
| 49 | Kristion Belcher | F | | 2.5 million | 7.5 million | 10 million |
| 50 | Charrod Taylor | DI | 4.75 million | | 14.25 million | 19 million |
| 51 | Tashomba Taylor | F | | 1.5 million | 4.5 million | 6 million |
| 52 | Osa Neal | F | | 1.25 million | 3.75 million | 5 million |
| 53 | Rose Neal | F | | 2.5 million | 7.5 million | 10 million |
| 54 | Jaja O'Neil | DI | 4.75 million | | 14.25 million | 19 million |
| 55 | Jasmine Baker | F | | 2.5 million | 7.5 million | 10 million |
| 56 | Denize Alton-Johnson | DI | 4.75 million | | 14.25 million | 19 million |
| 57 | Yvette Franklin | F | | 2.5 million | 7.5 million | 10 million |
| 58 | Erik Alton | F | | 1.25 million | 3.75 million | 5 million |

| Total | | | 128.75 million | 73 million | 605.25 million | 807 million |
|---|---|---|---|---|---|---|